# MARION R. BAILEY

## vs.

## PHILIP L. POE et al.

*Usury—Sale or Loan—Absolute Conveyance—Presumption.*

A transaction by which plaintiff, for a nominal considera-
tion, transferred property to defendants subject to a bank
mortgage, with an agreement that defendants might "rent"
the property on such terms as they might deem proper, that the
net rents, after payment of expenses, should, up to a named
sum, belong to defendants, plaintiff to guaranty that amount
of rents, and himself to receive any excess thereover, and that,
in case of sale of the property, defendants should receive a
named sum in addition to all expenses incurred by them, the
balance to be paid to plaintiff, and that, in case the property
was not sold before the maturity of the bank mortgage, defend-
ants should hold it free from any claim in favor of plaintiff,
*held* to involve, not a usurious loan, but a sale.      pp. 66-69

Where, on all the facts and circumstances, it is apparent
that the transfer of property is intended as security for a loan,
courts will go behind the form, however skillful the disguise
may be, and hold the transaction to be what it really is.     p. 69

The mere fact that the grantor, by an agreement executed
at the time of an absolute conveyance, is to receive the excess
of purchase money over a certain price in the event of a sale
by the vendee within a fixed time, does not necessarily consti-
tute the transaction a mortgage.      p. 69

The presumption is that an instrument in form an absolute
conveyance is what it purports to be, and to overcome this
presumption and to establish the instrument as a mortgage, the
evidence must be clear, unequivocal, and convincing.      p. 70

While an indebtedness is necessary to constitute a mortgage,
this does not mean that a stipulation to repay the principal in
money is necessary, and if the value of the land conveyed is so
much in excess of the amount paid that the grantee runs no

risk of loss on a resale, it is the same, if the transaction is shown to have been intended as a loan, as if there were a stipulation to repay the principal in money. p. 71

*Decided January 9th, 1923.*

Appeal from the Circuit Court No. 2 of Baltimore City (Carroll T. Bond, J.).

Bill by Marion R. Bailey against Philip L. Poe and others, trading as Poe & Davies, to have a transaction in form an absolute conveyance declared a mortgage. From a decree for defendants, plaintiff appeals. Affirmed.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, Stockbridge, Adkins, and Offutt, JJ.

*Francis R. Cross* and *W. Irvine Cross,* for the appellant.

*Albert E. Donaldson* and *Arthur W. Machen,* with whom were *Hershey, Machen, Donaldson & Williams* on the brief, for the appellees.

Adkins, J., delivered the opinion of the Court.

In April, 1920, Charles S. Bailey, brother of appellant, entered into a contract with the Metropolitan Savings Bank, to purchase the banking property at the Northeast corner of Calvert and Lexington Streets, Baltimore, for $200,000, paying $10,000 on account of the purchase money. The original contract provided for a cash payment of $50,000 and a mortgage for $150,000. Subsequently the bank agreed to take a mortgage for $165,000. This left $25,000 to be raised by Bailey.

Bailey bought this property with a view to erecting a large office building on that corner, to take the place of the old building, which was not only not susceptible of modern improvements, but had become greatly dilapidated. This

plan involved the raising of a large sum of money in addition to the $25,000 necessary to settle with the bank. For the purpose of capitalizing this project he undertook to organize a corporation. In furtherance of this scheme he sought the aid of Poe & Davies, the appellees, he having heard of their desire to secure more commodious and satisfactory quarters for their business. It seems that, shortly before the purchase of the property by Bailey, Poe & Davies had been negotiating for its purchase, and were offered it in fee for $180,000. The negotiations were terminated by the financial stringency which occurred about that time. But apparently the site was still attractive to them as a location for their offices. So, when they were approached by Bailey, they agreed to purchase one-third of the preferred stock provided he could dispose of the remainder of the preferred stock elsewhere. Part of the arrangement with Poe & Davies was that they were to have their offices in the proposed building on very advantageous terms to them. This plan, however, failed of accomplishment because of another disturbance in the money market. This left Bailey without means to make the payments which were overdue to the Metropolitan Savings Bank.

Besides he was indebted to a number of others. So the building scheme had to be abandoned, and the property was placed for sale by Bailey in the hands of several brokers, but no purchaser was secured. He also sought the assistance of Mr. H. Walter Ganster in procuring a loan. This effort also failed. Then some one suggested, whether it was Poe or Bailey is a matter of dispute, a plan by which Poe & Davies should lend Bailey $25,000 to enable him to settle with the bank, and take from him a mortgage for $35,000 subject to the bank's mortgage of $165,000, the said second mortgage to bear interest at the rate of six per cent., to be made to a Mr. Hoblitzel, a clerk of Poe & Davies, and to be assigned by him to them. This plan failed because of the advice of Messrs. Machen and Williams that such a loan would be usurious and illegal.

After an interval of some days a proposition was made—whether by Poe or by Bailey is again a matter of dispute—that Poe should put up $25,000 (as contended by appellees as purchase money for Bailey's equity of redemption, but, according to the testimony of Charles S. and Marion R. Bailey, as a loan) and take a deed of the property subject to the bank's mortgage of $165,000, the deed to be accompanied by a collateral agreement whereby, in the event of a sale for more than $35,000 over and above the bank's mortgage, and all interest, brokers' commissions, lawyers' fees, taxes and expenses of every sort in connection with the property, the excess should go to Bailey. This suggestion, according to Poe's testimony, was preceded by a proposal by Charles S. Bailey that Poe should buy Bailey's equity in the property by reimbursing him for the $10,000 he had paid the bank and take an assignment of his contract with the bank; which proposal Poe refused to consider. The subsequent suggestion above mentioned, however, was received favorably by him, and was referred to his counsel, Messrs. Machen and Williams, to be put in legal form, and on September 20th, 1920, the following papers were executed, viz.:

1.   A deed from the Metropolitan Savings Bank to Marion R. Bailey.

2.   Mortgage from Marion R. Bailey to Metropolitan Savings Bank for $165,000 balance of purchase money.

3.   Deed from Marion R. Bailey to Philip L. Poe, Edward L. Pittroff and Charles J. Hellman, co-partners trading as Poe & Davies, as joint tenants, conveying the property in question to them in fee simple, for "five dollars and other good and valuable considerations," subject to the above mortgage.

4.   Agreement between Marion R. Bailey, party of the first part, and Philip L. Poe, Edward L. Pittroff and Charles J. Hellman, co-partners doing business under the firm name of Poe & Davies, parties of the second part, as follows:

"This Agreement, Made this twentieth day of September, in the year 1920, by and between Marion R. Bailey, party of the first part, and Philip L. Poe, Edward L. Pittroff, and Charles J. Hellman, co-partners, doing business under the firm name of Poe & Davies, parties of the second part:

"Whereas, The Metropolitan Savings Bank of Baltimore has by deed dated the twentieth day of September, 1920, and intended to be recorded among the Land Records of Baltimore City on the 29th day of September, 1920, sold and conveyed unto the said party of the first part the property hereinafter described; and

"Whereas, The said party of the first part, in order to secure to the said bank that portion of the unpaid purchase money for said property, has executed a mortgage to the said bank in the sum of one hundred and sixty-five thousand dollars ($165,000), as will appear by the terms of said mortgage, which is dated the 20th day of September, 1920, and is intended to be recorded among the Land Records of Baltimore City on the 29th day of September, 1920; and

"Whereas, The said party of the first part has sold and conveyed the aforesaid property unto the said parties of the second part, subject to the aforesaid mortgage of $165,000.00; and

"Whereas, The aforementioned property is described as follows:

"Beginning for the same at the corner formed by the intersection of the north side of Lexington Street and the east side of Calvert Street, and running thence northerly binding on the east side of Calvert Street seventy-two (72) feet; thence easterly parallel with Lexington Street one hundred (100) feet to the west side of Davis Street; and running thence southerly binding on the west side of Davis Street seventy-two (72) feet to the north side of Lexington Street; and running thence westerly binding on the north side of Lexington Street one hundred (100) feet to the place of beginning.

BAILEY *vs.* POE.

[142

"Now, therefore, this Agreement witnesseth:

"That in consideration of the mutual promises and covenants of the parties hereto, the said parties hereto do hereby agree with each other as follows:

"First—That until the 28th day of September, 1925, or earlier maturity of said mortgage to the Metropolitan Savings Bank of Baltimore, the parties of the second part may rent the premises hereinabove described, or such part or parts thereof as they shall deem proper, for such rent and on such terms as the said parties of the second part may deem proper. All rents so derived from said property up to said time shall be collected by the said party of the first part for the account of the said parties of the second part, and shall forthwith be paid over to them, and disposed of by them as hereinafter expressed. Out of the same all taxes, water rents, insurance, necessary repairs, interest on said mortgage to the Metropolitan Savings Bank and any other necessary carrying charges or expenses shall be paid. The net rents derived from said property after payment of taxes, water rents, insurance, interest, and other charges or expenses aforesaid, shall up to the amount of two thousand, one hundred ($2,100) dollars per annum, belong to the said parties of the second part. The said party of the first part guarantees the said parties of the second part that a net rent of not less than two thousand, one hundred ($2,100) dollars per annum will be derived from said property after paying all taxes, water rents, insurance, interest and other charges and expenses aforesaid so far as the same shall not have been paid out of the net rents aforesaid. If the net rents derived from the property are not equal to two thousand, one hundred ($2,100) dollars per annum, or one thousand and fifty ($1,050) dollars for each six months, the party of the first part agrees to make good the deficiency to the parties of the second part at the end of each six months. If the said net rents derived from the property exceed two thousand, one hundred ($2,100) dollars per annum, or proportion-

ately for a fraction of a year, then the excess to be paid to the said party of the first part shall be paid over to him by the parties of the second part on the 20th day of September, 1923, or (if the parties of the second part shall before that time sell their interest in the property) then upon such sale.

"Second—If the said parties of the second part shall sell their interest in the property hereinabove described before the 20th day of September, 1923, or earlier maturity of said mortgage to the Metropolitan Savings Bank, then the said parties of the second part shall receive out of the purchase price the sum of thirty-five thousand ($35,000) dollars, and all arrears of the rental at the rate of two thousand, one hundred ($2,100) dollars per annum hereinbefore guaranteed to them by the party of the first part, and not previously paid to them, and a sum equal to all expenses of every kind and description, including counsel fees, incurred, contracted or sustained by the parties of the second part in or about the said property, or in protecting their interest in the same by paying off any charges, liens or incumbrances thereon, or in improving the same in any manner, or in or about carrying out this agreement, and all brokers' fees and other expenses incurred or contracted in making or attempting to make a sale. All the residue or balance, if any, of the proceeds of sale of the interest of the parties of the second part in said land shall be paid by them to said party of the first part.

"Third—If the parties of the second part shall not sell their interest in the property hereinabove described before the 20th day of September, 1923, or earlier maturity of the said mortgage to the Metropolitan Savings Bank, then so soon as the said mortgage shall mature and the principal of the said mortgage debt mature or become payable, this agreement shall cease and determine, and the said parties of the second part, their heirs and assigns, shall hold the said premises absolutely and in fee simple, free, clear and discharged

from any claim of the said party of the first part, or
any person or persons claiming by, under or through
him on the said premises or on the income therefrom;
subject, however, to the operation and effect of the
said mortgage to the Metropolitan Savings Bank of
Baltimore.

> "As witness the hands and seals of the par-
> ties hereto the day and year first above
> written.
> > "(Signed)
> > > "Marion R. Bailey.    (Seal)
> > > "Philip L. Poe,        (Seal)
> > > "Edward L. Pittroff,    (Seal)
> > > "Charles J. Hellman, (Seal)
> > "Co-partners doing business under
> > the firm name of Poe & Davies.

"Witness: Charles S. Bailey."

Just why Marion R. Bailey was made the grantee in the
deed from the bank is not positively proved, but it is reason-
ably clear from the evidence that it was because of the finan-
cial embarrassment of Charles S. Bailey.   At any rate we
concur in the conclusion of the learned trial judge that
Charles S. Bailey was the real party in interest and that
Marion R. was merely the holder of the legal title, and in-
terested only as a creditor of Charles S. Bailey.

The arrangement, made in this agreement, for Bailey to
collect the rents, did not work satisfactorily, he having col-
lected five hundred dollars rent from the Metropolitan Sav-
ings Bank and failed to turn it over to Poe & Davies, and
for other reasons, so the collection of rents and management
of the property was turned over to Francis N. Iglehart of
F. N. Iglehart & Co.

It soon developed that Bailey's views of the income to be
derived from the property had been too optimistic, and that
it was to be a losing proposition for Poe & Davies; so the
matter of selling the property was seriously considered.
Bailey, some time in the winter of 1920-21, asked Poe if he

would consent to Mr. Boisseau of the National Union Bank selling the property. This Poe authorized by a letter to Boisseau. The letter was not produced, but Poe's recollection of the price to be secured was $210,000. Iglehart and other brokers also endeavored to sell the property.

Finally Iglehart reported an offer of $205,000 from the Lafayette Bank, which was a tenant of part of the building, whereupon Poe & Davies on March 7th, 1921, wrote Bailey they were thinking of accepting the offer. The offer to Iglehart appears to have been raised later to $210,000.

While the negotiations between the said bank and Iglehart were pending, H. Walter Ganster, acting as attorney or broker for Bailey, was also attempting to sell the property to the bank through Hayden, Ganster's partner, and vice-president of the bank. Ganster testifies they were dickering for a couple of months and the bank finally made a flat offer of $210,000.

About March 9th, 1921, after the receipt of Poe's letter of March 7th, Bailey, Ganster, and Iglehart called on Poe, and Mr. Machen was called in by Poe. This meeting seems to have been marked by spirited discussion, between Ganster and Iglehart as to a division of brokers' commissions, and between Machen and Ganster as to the true meaning of the deed and agreement between Bailey and Poe & Davies; Ganster contending that, by a proper legal construction of these papers, the transaction amounted to a mortgage loan with the right of redemption in Bailey, and Machen insisting that the papers meant what they said; that the conveyance by Bailey to Poe & Davies was absolute except as to the contingent interest in Bailey provided by the agreement in any excess over $35,000 in the net proceeds of a sale (the mortgage of $165,000 and certain charges and expenses mentioned in the agreement being first deducted), if Poe & Davies should sell the property within three years or before the maturity of the said mortgage.

The result of this controversy was that, Poe & Davies having accepted the offer of $210,000 and entered into a contract of sale with William T. Hayden, attorney, who was acting for the Lafayette Bank, Marion R. Bailey, on the advice of Ganster, recorded the collateral agreement and advised The Maryland Title Company that Poe & Davies were only mortgagees and had no right to convey the property. This blocked the sale temporarily.

On June 1st, 1921, appellant filed his bill of complaint. In it, after referring to the deeds and mortgage and agreement herein before mentioned, he charges that the conveyance by appellant to the appellees, although absolute in terms, was intended only as a security in the nature of a mortgage for a loan of $25,000 and interest; that appellees received said deed as a mortgage, and that its purpose and effect as a mortgage is made clear by said agreement; that the legal effect of said deed and agreement was to create an equitable mortgage upon the said property to secure to appellees a net sum of $1,050, semi-annually, and the right to them to retain out of the proceeds of any sale of their interest in said property the sum of $35,000 net; that said deed and agreement did not empower appellees to sell and convey the said property in fee simple prior to the maturity of the mortgage debt to the Metropolitan Savings Bank of Baltimore; that appellant has duly and faithfully performed all acts and payments required of him by the said agreement, and has never been in default under the mortgage to appellees or the mortgage to the Metropolitan Savings Bank of Baltimore; that plaintiff is advised that appellees have fraudulently contracted to convey the said property in fee to the Lafayette Bank of Baltimore; that appellant, on or about the 25th day of November, 1920, entered into negotiations with the Lafayette Bank for a sale to it of the said property at a price of $225,000; that Poe, one of the appellees, advised appellant to discontinue said negotiations on the ground that the Lafayette Bank was not responsible; that appellant is informed that the board of directors of said bank, on or about the first

day of February, 1921, passed a resolution to purchase the
said property from him for $225,000, and that, on the next
succeeding day and before the plaintiff was advised of the
passage of the said resolution, appellees offered the said prop-
erty to said bank for $215,000, which offer was communi-
cated to appellant; that appellees, with a malicious intent to
prevent appellant from receiving an acceptable purchase
price for his said property, then offered to convey it in fee to
said bank for $210,000; that appellant refused to agree to a
sale at that price, and was assured by Poe on March 9th,
1921, that appellees would take no action with regard to the
disposal of said property prior to noon on the 12th day of
March, 1921; that said Poe, acting on behalf of appellees,
without regard to his assurances to appellant, and with a wil-
ful, wanton and culpable disregard of his interest in said
property, agreed, on the 9th day of March, 1921, with the
Lafayette Bank to sell said property to it in fee for $210,000;
that appellant was prevented from making a sale of said prop-
erty for a full, proper and adequate amount by the said in-
equitable and fraudulent proceedings of appellees; that the
true amount of the loan was $25,000, and if the provision of
the equitable mortgage is executed in accordance with the
agreement that appellee shall receive $35,000, it will insure
appellees an illegal and usurious rate of interest upon said
loan: that a fulfillment of the said contract of sale between
appellees and the Lafayette Bank would irreparably injure
and damage appellant in such a manner and to such an extent
that no damage recoverable by an action at law would afford
adequate compensation. The prayer of the bill is for a decree
declaring the said deed from appellant to appellees to be an
equitable mortgage; and for an injunction restraining appel-
lees from conveying the said property in fee until default by
plaintiff; and, upon default by the plaintiff and the sale of
the property, from receiving any sum greater than $25,000,
together with interest upon the said sum at the rate of six
per cent. per annum, and all taxes, water rents, insurance,
necessary repairs, interest on said first mortgage and any

other carrying charges or expenses incurred therein and from carrying out the said contract of sale with the Lafayette Bank; and restraining said bank from accepting from appellees a deed of said property; and for general relief. The bill was sworn to by appellant, and an order *nisi* was passed thereon by the court. A few days after the filing of the bill, the matter of commissions was satisfactorily arranged between the brokers, and Bailey was paid $7,500 by the Lafayette Bank, and, in consideration thereof, on the 4th day of June, 1921, executed a deed to the said William T. Hayden of all grantor's "right, title and interest and estate, both at law and in equity" in said property, "excepting therefrom, however, his right to proceed against the said Philip L. Poe et al., personally, for the recovery of said above mentioned usurious charge of $10,000 as a bonus for above mentioned loan."

On June 6th, 1922, appellees also executed a deed of the property to the said William T. Hayden. On the same day appellant filed a petition for leave to strike out of his bill of complaint the prayer for relief, in so far as it relates to the passage of a decree perpetually enjoining appellees from conveying said property in fee, and asking that the court rescind its order to show cause, so that the proceedings cannot be construed in any event as a *lis pendens* as to said property. On June 17th, 1921, appellees filed their answer, in which they denied the charge of fraud and all the allegations of the bill tending to show a loan. It sets out fully the history of the transaction from appellees' point of view. It specifically denies the charge that appellees told appellant that the Lafayette Bank was not responsible; that there was any malicious intent on the part of the appellees to injure appellant; that they acted in disregard of his interest; that the price was inadequate.

Testimony was taken in open court and on March 1st, 1922, the learned court below signed a decree dismissing the bill of complaint. From that decree this appeal was taken.

The only question to be decided is, was the transaction above outlined a sale or a loan? So far as its form goes, it could be either, and the determination of the question is a matter of intention. *Hopper* v. *Smyser,* 90 Md. 381.

The law is well settled, the only difficulty being in its application to the facts of each case. "The question in all such cases is, what is the real substance of the transaction, and not what color or form it has assumed." *Rouskulp* v. *Kershner,* 49 Md. 524.

Where, on all the facts and circumstances, it is apparent that the transfer of property is intended as security for a loan, courts will go behind the form, however skilful the disguise may be, and hold the transaction to be what it really is. *Tyson* v. *Rickard,* 3 H. & J. 109; *Andrews* v. *Poe,* 30 Md. 485; *Dryden* v. *Hanway,* 31 Md. 254; *Rouskulp* v. *Kershner,* 49 Md. 516; *Montague* v. *Sewell,* 57 Md. 407; *Gaither* v. *Clarke,* 67 Md. 18; *Funk* v. *Harshman,* 110 Md. 127.

On the other hand, the mere fact that the grantor, by an agreement executed at the time of the absolute conveyance, is to receive the excess of purchase money over a certain price in the event of a sale by the vendee within a fixed time, does not necessarily constitute the transaction a mortgage.

"That an instrument, or defeasance, executed by the grantee at the time of the absolute deed, for re-conveyance to the grantor, on his paying a sum of money, may constitute the transaction a mortgage, is undeniably true; but that such an instrument does not always operate that effect is a proposition equally certain; 7 *Cranch,* 23 (should be p. 236). The character of the transaction must in every case depend on the inquiry, whether the contract is a security for the re-payment of money. If it is, the parties are in the relation of mortgagor and mortgagee; but if it is not, the transaction must take the stamp of a conditional sale." *Hicks* v. *Hicks,* 5 G. & J. at p. 86. See also *Hinkley* v. *Wheelwright,* 29 Md. 348; *Packard* v. *Corporation for Relief, etc.,* 77 Md. 247; *Northern Central Railway Co.* v. *Herring,* 93 Md. 164; *Flagg* v. *Walker,* 113 N. S. 677.

"The sure test and essential requisites" of a mortgage, "are the continued existence of a debt. If there is no indebtedness the conveyance cannot be a mortgage; if there is a debt existing and the conveyance was intended to secure its payment, equity will regard and treat the absolute deed as a mortgage. The presumption of course arises that the instrument is what it purports on its face to be, an absolute conveyance of the land; to overcome this presumption, and to establish its character as a mortgage, the cases all agree that the evidence must be clear, unequivocal and convincing, for otherwise the natural presumption will prevail." *Rosenstock* v. *Keÿser,* 104 Md. 386; *Pom. Eq. Jur.,* vol. 3, sec. 1196; *Funk* v. *Harshman,* 110 Md. at p. 130. See also *Hooper* v. *Smyser, supra; Conway* v. *Alexander,* 7 Cranch, at p. 237; *Macaulay* v. *Porter,* 71 N. Y. at p. 177. Does the evidence in this case overcome that presumption? We think not.

There is an absolute absence of proof of fraud, or of any malicious intent on the part of appellees to injure appellant, or that they consciously acted in disregard of his interest, as alleged in the bill. It is admitted that the allegation in the bill, that the Lafayette Bank passed a resolution to purchase the property at $225,000, was erroneous. There was a resolution to pay $215,000 for it if necessary; but the uncontradicted testimony is that this was unknown to appellees, and that they endeavored to obtain from the bank $215,000, but were advised by Iglehart that the bank would not pay more than $210,000, and that no more could be gotten for the property.

Undoubtedly, if the proposition to lend $25,000 and to take an assignment of a mortgage for $35,000 had been carried out, it would have been a usurious loan. But when considering the plan, Poe seems to have been thinking of buying a security at a profit rather than of obtaining usurious interest on a loan. His business was that of buying and selling securities rather than that of lending money, and when he was advised that such a transaction could only be regarded as a loan, it was promptly abandoned.

In subsequent negotiations, according to the decided weight of the evidence, it was made plain to appellant that Poe & Davies were buying the property and not making a loan upon it, and that appellant was incurring no personal responsibility to repay the $25,000 purchase money, or the $35,000, which was fixed by the agreement as the amount which Poe & Davies were to retain, net, in case of a sale of the property by them before the maturity of the mortgage to the Metropolitan Savings Bank. It is true that appellant guaranteed that the net rents from the property during the time the agreement was to remain in force should be $2,100 a year, which is equal to six per cent. upon $35,000. But there was no agreement that this should be paid as interest, although that amount seems to have been arrived at from the fact that Bailey had thought he could afford to pay that much as interest when the loan plan was under consideration. The mere fact that the amount to be guaranteed as rent was reached in that way does not make it interest. *Packard* v. *Corporation for Relief, etc., supra; Northern Central Ry. Co.* v. *Herring, supra; Rosenstock* v. *Keyser, supra.*

The principle quoted from *Rosenstock* v. *Keyser, supra,* that "if there be no indebtedness the conveyance cannot be a mortgage," does not mean that a stipulation to repay the principal in *money* is necessary. "It is enough if the principal is secured and not *bona fide* put in hazard, and it matters not what the nature of the security is, if it is sufficient. * * * The true ground is, not that there must be a stipulation to repay the principal at all events in money, but that it must in some way be secured, as distinguished from being put in hazard; but whether it is secured by pawn or pledge or a conveyance of land, or is by agreement to be returned in lands, goods or money, is not material. If the principal is secured and the interest reserved is more than the law allows, it is usury." *Tyson* v. *Rickard,* 3 H. & J. at p. 114.

The meaning of that, of course, is that, if the value of the land conveyed is so much in excess of the amount paid that the grantee runs no risk of loss on a resale, it is the same, if in

other respects the transaction is shown to have been intended as a loan, as if there were a stipulation to repay the principal in money. But that cannot be fairly said about this case, as there was no such assured excess in the value of the property over the purchase price actually paid by the appellees. *Hicks* v. *Hicks,* 5 G. & J. at p. 85.

As bearing upon the intention of the parties, it is significant that Poe declined to permit a clause to be written in the agreement giving Bailey an option to re-purchase the property at any time during the life of the agreement although Bailey requested it. This is admitted by Bailey. It is true Bailey testifies that Mr. Machen told him that would make no difference, as he would have that right anyhow; but Machen positively denies that he said any such thing, and it is hardly credible that he could have made such a statement, in view of all the circumstances of the case.

Finding no error in the ruling of the learned trial court, the decree will be affirmed.

> *Decree affirmed and bill dismissed, with costs to appellees.*