[Civil No. 3061. Filed February 1, 1932.]

[7 Pac. (2d) 586.]

CHARLES S. WALLACE, Appellant, v. FIRST NATIONAL BANK OF ARIZONA AT PHOENIX, a Corporation, and DWIGHT B. HEARD INVESTMENT COMPANY, a Corporation, Appellees.

Mr. L. J. Cox, for Appellants.

Messrs. Armstrong, Kramer, Morrison & Roche, for Appellee Bank.

ROSS, J.—This action was commenced by the First National Bank of Arizona at Phoenix on the past-due promissory note of the Dwight B. Heard Investment Company dated February 23, 1927, and to foreclose a

mortgage of even date on an undivided one-half of lot 1, block 66, Original Townsite of Phoenix, Maricopa county, Arizona given to secure the note. In addition to the mortgagor, C. S. Cousins and Charles S. Wallace were made parties defendant because of some adverse claim, right or title being asserted by them to the premises. Cousins made no appearance. Wallace, answering the complaint, set up title in himself and denied that the mortgagor investment company had any right, title or interest in the mortgaged premises. He also filed a cross-action to quiet his title to the premises.

The case was tried before a jury, but after the evidence was all in the court decided that there were no disputed issues of fact, discharged the jury, and rendered judgment in favor of the bank against the investment company as prayed and quieted title in the investment company as against Wallace. Wallace has appealed. While it is very doubtful whether any of his assignments conform to the rules of the court, we have concluded to examine the points raised by him and to base our decision upon the merits of the case.

A history of the case is indispensable to an understanding of the contentions of the parties and also their rights. The investment company and Wallace claim title from a common source, to wit, Lincoln Fowler. On July 1, 1909, said lot 1 was deeded to Ada Irvin and Lincoln Fowler and, according to the records of deeds of Maricopa county, these grantees remained the owners thereof as long as they lived. On February 16, 1925, defendant Wallace became the owner, through an order of the probate court, of Ada Irvin's undivided one-half interest, and the investment company, on January 24, 1927, became the owner, by purchase from the heirs and/or devisees of Lincoln Fowler, of the Fowler undivided one-half interest.

Wallace claims that, although the record title to one-half of said lot was in Fowler all this time, the whole title was in fact in Ada Irvin from December 7, 1909. He testified to seeing in the possession of Ada Irvin a warranty deed of that date from Fowler to her of his undivided one-half interest. Ada Irvin died May 12, 1923, and this witness claims to have seen the deed in her possession as late as May 8th. That there was such a deed in existence is not disputed, but why it was given, or why it was never placed of record, or what became of it, is not shown, except that it was missing from the papers of Ada Irvin after her death.

Wallace was named by Irvin in her will as executor thereof, as also the residuary legatee of her estate. He was in addition a brother of deceased and her sole heir at law. As executor he took possession of his sister's estate and proceeded to and did administer it during the lifetime of Lincoln Fowler. An inventory and appraisement of the Irvin estate was made and returned to the court on August 31, 1923. In this inventory as an asset of the estate was included only an undivided one-half of lot 1, block 66. The Fowler one-half of said lot was not inventoried as an asset of the Irvin estate. The inventory did, however, contain this item: "Claim against Lincoln Fowler of Phoenix, Arizona (problematical value—estimated), $17,500.00." On the day the inventory was filed Wallace, as the executor, filed his petition in the court asking that he be authorized to compromise and settle the claim against Fowler upon the terms and conditions therein set forth. The court, considering said petition, on the same day authorized and directed the executor to make the compromise and settlement with Fowler proposed in his petition. This he did on the same day and gave to Lincoln Fowler the following receipt and release:

"Release.

"Know all men by these presents: That I, Charles S. Wallace, Executor of the Estate of and residuary legatee and devisee under the will of Ada Irvin, Deceased, and as heir at law of Ada Irvin, Deceased, for and in consideration of the sum of $15,153.92, to me paid by Lincoln Fowler . . . do hereby . . . remise, release and forever discharge Lincoln Fowler, his heirs, executors and administrators from all (any) and all manner of actions, causes of action, suits, debts, dues, accounts, covenants, contracts, agreements, judgments, claims and demands whatsoever, in law or in equity, which the Estate of Ada Irvin, Deceased, ever had, now has, or which it hereafter can, shall, or may have against the said Lincoln Fowler, for or by reason of any cause, matter or thing whatsoever from the beginning of the world to the date of these presents, and more particularly arising out of any transactions between the said Ada Irvin and the said Lincoln Fowler in connection with any lands consisting of either city property or farm lands and all other property situate in Maricopa County, Arizona, including the Northwest Quarter of Section 36, Township 1 South, Range 5 East, G&SRB&M, and an undivided one-half interest in and to Lot 1, Block 66, Phoenix, Maricopa County, Arizona

"In witness whereof, I, Charles S. Wallace, Executor of the Estate of and residuary legatee and devisee under the will of Ada Irvin, Deceased, and as heir at law of Ada Irvin, Deceased, have hereunto set my hand this 31 day of August, 1923.

"[Signed]    CHAS. S. WALLACE,
"Executor, etc."

It is the contention of Wallace that the compromise was of a money demand by the Irvin estate against Fowler for rents he had collected and moneys he had received belonging to Irvin, and did not involve or concern the title to the undivided one-half interest of said lot 1. The refusal of the court to permit defendant to introduce parol testimony to sustain

this contention is assigned as error. It is not suggested anywhere that there was any fraud or mistake in the compromise. Indeed, it appears that both parties were represented by able counsel. So, whatever the compromise on its face shows was included within its terms, we must conclude was fully understood and consented to by both parties. If by proper pleading it were contended that either fraud or mistake entered into the compromise, parol evidence would be admissible to explain the fraud or mistake. But there was no fraud or mistake. The parties not only acted upon the advice of counsel, but secured the court's approval of the compromise, release and settlement. The whole thing was done under the supervision and control of the court. The language in which the compromise is couched is plain, clear and unambiguous. No one can mistake its meaning. It evidently was intended to put an end to any and all claims, of every nature and kind, the Irvin estate had or might or could have against Lincoln Fowler, and specifically any claim arising out of "an undivided one-half interest in and to Lot 1, Block 66, Phoenix, Maricopa County, Arizona." There appearing to be no fraud or mistake in the compromise, or ambiguity in the instrument setting forth the subjects and terms of the compromise, the refusal of the court to admit parol evidence to explain, contradict or vary the terms thereof was clearly right, and the construction of the compromise agreement was purely one for the court. *Miller Cattle Co.* v. *Mattice,* 38 Ariz. 180, 298 Pac. 640; *Merchants & Stock Growers Bank* v. *Marley,* 33 Ariz. 294, 264 Pac. 471; *Kreig* v. *Hammels,* 29 Ariz. 280, 240 Pac. 1031; *Carrick* v. *Sturtevant,* 28 Ariz. 5, 234 Pac. 1080; *Jones* v. *Morrison,* 24 Ariz. 367, 210 Pac. 472; *Valentine* v. *Sheperd,* 19 Ariz. 241, 168 Pac. 643; *Wadin* v. *Czuczka,* 16 Ariz. 371, 146 Pac. 491. Unless parol evidence was permissible to contradict the written

record and compromise, there was nothing for the jury to act on, hence the court's action in dismissing the jury was correct.

Just what should be said about the deed from Fowler to Irvin and its effect is problematical. If the deed was unconditionally delivered to Irvin by Fowler, the title passed to Irvin whether it was recorded or not. If it was delivered on condition that it would not be effective until the happening of some event, it did not pass title and that may account for its not being placed of record. But granting that the Fowler deed had the effect of vesting the whole title in Irvin, we think it would not be questioned but that she in her lifetime, by a compromise such as the one here, could have estopped herself from asserting title to the Fowler one-half interest even as against Fowler himself. If in the face of such a compromise she had suggested that the only way she could be divested of title was by a conveyance containing proper operative words, equity would have quickly and promptly applied to the situation the rule of estoppel and treated that as done which should be done.

The defendant, in his multiple capacity of executor, residuary legatee and sole heir at law, surely is in no better position than his benefactress. He was dealing with the property of the estate, not only in his representative capacity but as the owner. As the owner at least he should be held to the compromise, in which he agreed to release all claims to the lot involved. If a deed of conveyance from Irvin or her personal representative were the only way to secure to Fowler and his heirs or assigns title to one-half interest in the lot involved, a court of equity would not hesitate upon the facts here shown to require the execution of such conveyance. We think the situation justified the application of the maxim "equity regards

the substance rather than the form," as explained in 21 Corpus Juris 204, 205, section 200:

"This maxim is as applicable at the present time as it was when it was first formulated. By force of its principle equity goes behind the form of a transaction in order to give effect to the intention of the parties, either to aid in (an) act abortive at law because formally defective, or to impose a liability as against an evasion by a formal concealment of its true character. In the construction of a written instrument, equity always attempts to get at its substance, and to ascertain, uphold, and enforce the rights and duties that spring from the real intention of the parties. In doing so, while it will of course not change the words of the instrument, the court of equity will look into all the circumstances under which it was made, in order to determine the proper meaning of the transaction. It will do this not only to sustain a just claim but to defeat an unlawful demand."

The judgment is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.