372 P.2d 335

Hubert MERRYWEATHER, Appellant,

v.

T. T. PENDLETON, J. B. Pendleton, James V. Robins, Baca Float Ranch, Inc., and Valley National Bank of Phoenix, a national banking association, Appellees.

No. 6572.

Supreme Court of Arizona.

En Banc.

June 14, 1962.

Herbert Mallamo, Phoenix, Nasib, Karam, Nogales, and Lewis, Roca, Scoville, Beauchamp & Linton, Phoenix, for appellant.

Darnell, Holesapple, McFall & Spaid, Tucson, for appellees T. T. Pendleton, J. B. Pendleton, James V. Robins and Baca Float Ranch, Inc.

Gust, Rosenfeld & Divelbess, Phoenix, for appellee Valley Nat. Bank.

Paul LaPrade, Elmer C. Coker, James E. Flynn, Foster G. Mori, Loretta Whitney, Valdemar A. Cordova, Keith A. Haien, Charles N. Walters, Rudolph Mariscal, Langmade & Langmade, Phoenix, Chandler, Tullar, Udall & Richmond, Wolfe, Greer & Knez, Rees, Estes & Browning, Tucson, amici curiae.

BERNSTEIN, Chief Justice (on rehearing).

This is a suit in equity to have an agreement in the form of an absolute sale of stock declared to be an equitable mortgage. The facts concerning this transaction and other circumstances leading up to the agreement are more fully outlined in the previous opinion in this case, 90 Ariz. 219, 367 P.2d 251.

The cause was tried to an advisory jury which returned a general verdict and answers to 13 special interrogatories in all respects favorable to the plaintiff-appellant, Merryweather. The superior court granted defendant-appellee's motion to set aside the findings and verdict of the jury, and entered judgment for Pendleton. In the original opinion, the majority of this court affirmed the action of the court below.

We granted the motion for rehearing upon the urging of appellant and the amici curiae that the decision heretofore rendered beclouded the legal principles dealing with equitable mortgages previously established by this and other courts, and was contrary to fundamental justice. They pointed out that some of the authorities relied upon by the previous majority opinion have been significantly qualified, and that the court misapprehended some facts upon which portions of that opinion were based.

Plaintiff Merryweather was the owner of 5997 shares (50% of the issued stock) in the Baca Float Ranch, Inc. in Santa Cruz County. Defendants T. T. Pendleton and Jim Pendleton controlled the remaining shares in the corporation. Merryweather was under financial pressure from dealings not concerned with the ranch operation, and over a period of several years had engaged in a series of loans in which the Baca Float stock was pledged as security. In July of 1954, Merryweather paid off a $160,000 loan from T. T. Pendleton and incurred an $180,000 thirty day obligation to D. M. Haggard. The following month T. T. Pendleton agreed to loan Merryweather $180,000 to pay off the Haggard loan, but this loan was never consummated as Merryweather needed $200,000 by this time. The Haggard loan was extended to January 24, 1955.

As the due date of the Haggard loan approached, Merryweather again contacted Pendleton with a view to raising the funds necessary to pay off this obligation, which by now had increased to $220,000. It is at this point that testimony of the parties diverges. Merryweather stated that Pendleton agreed to loan $200,000 and take the stock as security, and it was not until the morning of January 25th, 1955, shortly before the agreement was signed, that he first learned that the instrument was drawn up in the form of a sale with option to repurchase. He testi-

fied that Pendleton assured him that this form was used because the Valley National Bank, which was supplying funds to Pendleton, required that the stock be held in Pendleton's name, and that Pendleton agreed that there would be no changes in the organization or operation of the ranch during the period of the agreement. Pendleton's testimony was that he had insisted on several occasions that he would not again become involved in a loan or pledge involving the Merryweather stock, but that he would buy it for $200,000 and give Merryweather a one year option to repurchase the stock upon payment of 5% interest. Pendleton said he wanted this form of transfer to avoid the trouble of a foreclosure sale. In its answers to the special interrogatories, the advisory jury accepted Merryweather's view of these dealings.

We are faced at the outset with the question of the scope of review by this court in a case of this nature. Here an advisory jury answered special interrogatories and returned a verdict favorable to the plaintiff, Merryweather. The trial court set aside this verdict, entered findings of fact in some respects different from those of the jury, and gave judgment for the defendant, Pendleton. We have previously indicated that where a trial court disregards the verdict of an advisory jury, the judgment of the court and not the answers of the jury must be assumed to be correct, Carrillo v. Taylor, 81 Ariz. 14, 299 P.2d 188 (1956), and that where a case is tried to the court, and the court does not enter findings of fact, the judgment of the court will be upheld if there is any substantial evidence to support it, State Tax Commission v. Graybar Electric Co., 86 Ariz. 253, 344 P.2d 1008 (1959); Kellogg v. Bowen, 85 Ariz. 304, 337 P.2d 628 (1959).

However, when, as here, the court makes findings of fact, review of these findings is governed by 16 A.R.S. R.Civ.P. 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." In the leading case interpreting the words "clearly erroneous" the United States Supreme Court said:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).[1]

---

1. Judge Learned Hand has given this insight into the rule:
  "It is idle to try to define the meaning of the phrase 'clearly erroneous'; all that can profitably be said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury,

■ Of course, a finding of a trial court is clearly erroneous where it is induced by an erroneous view of the law, Galena Oaks Corp. v. Scofield, 218 F.2d 217 (5th Cir. 1954). This rule applies in the case at bar. The trial court did not make an express finding of the parties' intent in entering the agreement in question, but impliedly found that an absolute sale was intended since it found that there was no continuing obligation on Merryweather to pay Pendleton for the stock, and that Merryweather "sold" the stock to Pendleton. We think these findings were induced by the view of the trial court that Merryweather had the burden to prove "beyond question" the continuing existence of an obligation to repay the funds procured from Pendleton.

The trial court, in setting aside the verdict and findings of the advisory jury stated:

"An examination of the agreement nowhere reveals any obligation on the part of the plaintiff to pay the indebtedness in any event, * * * The plaintiff did not sign any promissory note, nor was any evidence adduced from which the court could construe a continuing obligation to pay the defendants any amount whatever. * * *"

will nevertheless reverse it most reluctantly and only when well persuaded."

The court accepted the defendant's position, stating:

"[A]n essential requisite to the setting aside of an instrument absolute in form in order to construe it as a mortgage or pledge is that the obligation to pay the indebtedness must appear beyond question from the evidence."

■ We do not believe that this position accurately states the law. It is certainly true that, in order for a conveyance absolute in form to be held to be a mortgage, a debtor-creditor relationship must exist between the mortgagor-seller and mortgagee-buyer. Charter Gas Engine Co. v. Entrekin, 30 Ariz. 341, 246 P. 1038 (1926); Goodfellow v. Goodfellow, 219 Cal. 548, 27 P.2d 898 (1933); Hess v. Hess, 164 Kan. 139, 187 P.2d 383 (1947). And where the court finds that the parties intended that such a relationship should not exist, or that a pre-existing indebtedness should be extinguished by the conveyance, no mortgage can exist. Charter Gas Engine Co. v. Entrekin, supra; Miller v. Stringfield, 45 Ariz. 458, 45 P.2d 666 (1935). But it is quite a different thing to require that this one element be shown beyond question by express evidence in every instance where an attempt is made

United States v. Aluminum Co. of America, 148 F.2d 416, 433 (2d Cir. 1945).

to show that an absolute conveyance is in fact a mortgage or pledge. The important consideration is: What did the parties intend? Did they intend a security transaction or did they intend a bona fide bargained-for sale of the property in question? Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986 (1960).[2] Was the property transferred for the purpose of assuring repayment, or was the property itself the consideration for which funds were paid?

■ The absence of any clear indication of continuing debt argues strongly for an absolute sale, Murry v. Butte-Monitor Tunnel Mining Co., 41 Mont. 449, 110 P. 497, 112 P. 1132 (1910); 59 C.J.S. Mortgages § 38, but where the agreement is otherwise shown to have been intended as a security transaction, it is not essential that the debt itself be shown. Murry v. Butte-Monitor Tunnel Mining Co., supra; Henderson Baker Lumber Co. v. Headley, 247 Ala. 681, 26 So.2d 81 (1946); Tansil v. McCumber, 201 Iowa 20, 206 N.W. 680 (1925); Kerfoot v. Kessener, 227 Ind. 58, 84 N.E.2d 190 (1949); Jones, Mortgages §§ 316, 323, (8th Ed. 1928); 59 C.J.S. Mortgages § 38; 36 Am.Jur., Mortgages § 152. Where it is clear that the arrangement was a loan in substance,

the existence of a continuing debt may be implied, Murry v. Butte-Monitor Tunnel Mining Co., supra; Henderson Baker Lumber Co. v. Headley, supra; Bordan v. Hall, 255 S.W.2d 920 (Tex.Civ.App.1951). It is not necessary that a personal obligation of the mortgagor or pledgor be shown, Osborne v. Osborne, 196 Iowa 871, 195 N.W. 586 (1923); Tansil v. McCumber, supra; Kerfoot v. Kessner, supra; 59 C.J.S. Mortgages § 38, as among other reasons, the pledgee may have agreed to look only to the pledged property as security for his claim. King v. McCarthy, 50 Minn. 222, 52 N.W. 648 (1892); Campbell v. Dearborne, 109 Mass. 130, 12 Am. Rep. 671 (1872).

■ The ruse of an absolute deed or deed with an option to repurchase has long been used in attempts to cut off a mortgagor's equity of redemption. Equity courts created the concept of equitable mortgages to avoid such abuses. Y.B. 9 Edw. IV 25, 34, (1470).

■ Equity regards the substance rather than the form of the transaction, Kennedy v. Morrow, 77 Ariz. 152, 268 P.2d 326 (1954) and will go behind the form to impose liability or defeat an unlawful claim,

---

2. In this case the court held a sale with option to repurchase to be a mortgage in fact while noting (in connection with *another point*), "*It is true that nowhere* in the various instruments involved in this transaction is there a promise by plaintiff to make any repayment to defendant." 87 Ariz. at 392, 351 P.2d at 990.

Wallace v. First Nat'l Bank, 39 Ariz. 451, 7 P.2d 586 (1932).

The intent of the mortgagee in such cases is to avoid the trouble of foreclosing in compliance with the governing statute. Thus, Pendleton testified as to his reason for putting the agreement in the form of a sale with option to repurchase:

"Q In deciding the route that you would go in helping Hubert or in keeping others from getting interested in the Baca Float Corporation you decided that you did not want any agreement which would require you to foreclose Merryweather's stock?

"A I will say that was partly the reason.

"Q And what was the rest of the reason, sir?

"A Well, it just seemed simpler to me than going through all this complicated foreclosing and trouble that had been going on here for four or five years.

"Q Now, I take it that by going this route of sale you knew that at the end of this year's time you would not have to put the stock up for sale and have a public or private auction of it. Is that what you were trying to avoid?

"A Yes, that was one thing."

From the foregoing it is apparent that the transaction took the form of a sale with option to repurchase for the purpose of assuring that Pendleton was repaid his money, but without the trouble of a complicating foreclosure.

Certainly the mortgagee who insists on an agreement in the form of an absolute conveyance does not intend that the agreement be a "mortgage" in the sense that a mortgage includes a right of redemption that can only be cut off by foreclosure proceedings. This is the very thing he intends that it should not be. But equity will not permit the mortgagee's intent to be effectuated where it appears that in substance the arrangement is a security transaction. Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986 (1960); De Wulf v. Bissell, 83 Ariz. 68, 316 P.2d 492 (1957). To require express evidence of a continuing debt obligation before equity may open its eyes to the true nature of the transaction would indeed make wide the way for overreaching lenders to accomplish their purposes.

"It is not to be expected that the party would, by taking personal security effectually defeat his own attempt to avoid the appearance of a loan." Russell v. Southard, 12 How. 139, 53 U.S. 139, 152, 13 L.Ed. 927, 932 (1851).

In determining whether a transaction was for security purposes or was a bona fide sale, the courts consider the following factors: (1) the prior negotiations of the parties;[3] (2) the distress of the "grantor";[4] (3) the fact that the amount advanced was about the amount that the grantor needed to pay an existing indebtedness;[5] (4) the amount of the consideration paid in comparison to the actual value of the property in question;[6] (5) a contemporaneous agreement to repurchase;[7] and (6) the subsequent acts of the parties, as a means of discerning the interpretation they themselves gave to the transaction.[8]

No one of these factors is conclusive, but a combination of several will go a long way in showing that an absolute conveyance was actually a security arrangement. In cases of doubt the courts tend to hold the agreement to be a mortgage since this protects all parties and prevents forfeiture of the pledged property, McLendon v. Davis, 131 So.2d 765 (Fla.App.1961); Tansil v. McCumber, supra; Perry v. Southern Surety Co., 190 N.C. 284, 129 S.E. 721 (1925).

Turning to the facts in this case, as they apply to the six foregoing factors, we see: (1) Pendleton had previously loaned Merryweather $160,000 which had been repaid. The agreement in question also had its inception in negotiations for a loan. Pendleton originally agreed to lend Merryweather $180,000 and take the stock as security, but this arrangement was not carried out because Merryweather needed more funds; (2) Merryweather was financially distressed—he was forced to pay large bonuses to obtain money to pay off a series of loans on the stock in question. At the time of the agreement, Merryweather was faced with a garnishment of his stock and the necessity of raising $220,000 to pay Haggard. Pendleton knew of this financial distress, and of the possible foreclosure of Merryweather's interest in

3. Tansil v. McCumber, 201 Iowa 20, 206 N.W. 680 (1925), O'Briant v. Lee, 214 N.C. 723, 200 S.E. 865 (1939); 59 C.J.S. Mortgages § 40; 36 Am.Jur. Mortgages § 148.
4. Greene v. Bride Son Const. Co., 252 Iowa 220, 106 N.W.2d 603 (Iowa 1960); Kemp v. Earp, 42 N.C. 167 (1850); 59 C.J.S. Mortgages § 42.
5. Tansil v. McCumber, supra, note 3.
6. Ellis v. Wayne Real Estate Co., 357 Mich. 115, 97 N.W.2d 758 (1959); 59 C.J.S. Mortgages § 41, 36 Am.Jur. Mortgages § 153. Cf. Bailey v. Poe, 142 Md. 57, 120 A. 242 (1923): The rule that, " * * * 'if there is no indebtedness, the conveyance can not be a mortgage,' does not mean that a stipulation to repay the principal in money is necessary. * * * The meaning of that, of course, is that, if the value of the land conveyed is so much in excess of the amount paid that the grantee runs no risk of loss on a resale, it is the same, if in other respects the transaction is shown to have been intended as a loan, as if there were a stipulation to repay the principal in money."
7. Handrub v. Griffin, 127 Kan. 732, 275 P. 196 (1929); Britz v. Kinsvater, 87 Ariz. 385, 351 P.2d 986 (1960).
8. 59 C.J.S. Mortgages § 47, 36 Am.Jur. Mortgages § 157, and cases cited therein.

the ranch; (3) The funds were used to pay an existing indebtedness. Merryweather needed $220,000 to redeem his stock from Haggard—he obtained $20,000 from other sources and $200,000 from Pendleton on the agreement in issue; (4) The consideration was disproportionate for a sale. The trial court found the value of Merryweather's stock at the time of the agreement was $394,000, the jury found it was worth $630,000; (5) The agreement contained an option to repurchase;[9] (6) Following the agreement Pendleton treated Merryweather in the same manner as when he was the owner of the stock and a director of the corporation. On Pendleton's order all information of the corporation was made available to Merryweather as before. It is quite clear that Merryweather considered the transaction to be a mortgage and loan at all times, and that he made Pendleton aware of this attitude.[10]

It also appears significant to us that Merryweather paid $220,000 to redeem his stock from Haggard on the same day he purportedly "sold" it to Pendleton for $200,000—hardly something a reasonable businessman would do. Nor can the price discrepancy be justified by the option to repurchase. The agreement contemplated the payment of 5% *interest* upon the exercise of this "option."

■ Considering the evidence as a whole, and accepting that view of the facts most favorable to the defendant, who prevailed below, we nevertheless are convinced that the trial court erred in concluding that the agreement contemplated a sale, rather than a security arrangement. It is apparent that the trial court was lead to its conclusion concerning this vital issue by the erroneous belief that the existence of a continuing debt obligation must be proved "beyond question" from the agreement or other direct evidence.

■ This court may make a final determination of a case, especially an equity suit, Brazee v. Morris, 68 Ariz. 224, 204 P.2d 475 (1949), and may render such judgment as should have been rendered

---

9. The agreement was in substance little more than an option to repurchase. It recited and confirmed a pre-existing agreement for a sale, and while it specified the repurchase price ($200,000 plus 5% interest) it does not even allude to a sale price!

10. During cross-examination of Pendleton, the following occurred:

"Q  I will ask you, sir, if it is not true that in the fall of 1955 Hubert asked you if it would help you any if he should pay the money back prior to its due date.

"A  Yes; he said something like that.

"Q  And what was your statement to that, sir?

"A  I said, 'Well, it didn't make any difference. It wouldn't help me.'

"Q  Did you tell him that if he did not pay the money on the due date, that is, on January 25, 1956, that you were taking the stock over as your own?

"A  It was never discussed."

below, except when it is necessary that some matter of fact be ascertained, or the damages assessed or the matter to be decreed is uncertain, A.R.S. § 12–2103; Miller v. Douglas, 7 Ariz. 41, 60 P. 722 (1900); Brazee v. Morris, supra; Arizona State Bank v. Crystal Ice & Cold Storage Co., 26 Ariz. 82, 222 P. 407 (1924) modified 26 Ariz. 205, 224 P. 622 (1924); cf. Olvey v. Calizona Land & Cattle Co., 76 Ariz. 368, 265 P.2d 432 (1954). The trial of this suit required 11 days in court; the transcript of the testimony fills five volumes. No party has suggested that any relevant matter has been overlooked. The advisory jury, under proper instructions which required that the plaintiff prove by clear and convincing evidence that the transaction was a pledge or mortgage rather than a sale, returned a general verdict and answers to 13 special interrogatories in all respects favorable to the plaintiff, Merryweather. We believe these findings are supported by the record. Moreover, we may take the jury's verdict as a guide to the demeanor and veracity of the witnesses. Where, as here, the trial court set aside the verdict of the advisory jury, not because it felt the defendant's witnesses were more credible, but because it labored under a mistake of law as to what the plaintiff was required

to prove, a proper setting exists for the reviewing court to exercise its power to make a final determination of the issues and direct the entry of the judgment the lower court should have entered. A.R.S. § 12–2103.

We therefore reverse the findings and conclusions of the trial court on the issue of the intent of the parties in entering the agreement of January 25, 1955, and the effect thereof. It is our determination that the defendant, T. T. Pendleton, holds the Baca Float stock covered by that agreement as security for the repayment of Merryweather's obligation to him.

In his complaint, the plaintiff prayed for a judgment that the defendant Pendleton held the stock in question as a pledge for the repayment of $200,000 together with interest at the rate of 5% from January 25, 1955, until paid. During the course of the trial, the plaintiff sought to amend his complaint to state a claim against the defendant bank for converting the stock and for preventing him from performance by refusing to accept his "tender". The denial of this motion has been assigned as error. In our view, Merryweather never made a proper tender of performance to either Pendleton[11] or to

11. On January 24, 1956, Merryweather called Pendleton from Phoenix:
  "* * * I said I had moneys available and that rather than go out and

borrow large additional sums of money to take care of the entire note in one fellswoop, and knowing that the Valley National Bank had loaned him money

any agent of Pendleton's.[12] Nor did he deposit the money with the court in an effort to terminate his obligation to pay interest, cf. Automatic Equip. Co. v. Mohney, 295 Ky. 451, 174 S.W.2d 716 (1943). Interest is awarded as compensation for the use of money.[13] Here, Merryweather has had the use of the money loaned him since 1955, the defendant bank has been an involuntary lender almost that long. We agree with the plaintiff's original view of the case,[14] and hold that the bank has a lien against the Baca Float stock in question as security for the payment of $200,-000 and interest from January 25, 1955.

The case is remanded with directions to the trial court to enter judgment in accordance with this opinion.

STRUCKMEYER, JENNINGS and LOCKWOOD, JJ., concur.

---

on the stock, and having some hunch as to how banks work, I was under the impression that it would be a good idea for me to pay say Fifty thousand dollars and make a sizeable reduction of the loan and have the loan extended, and Mr. Pendleton didn't say very much.

"Q. What did he say?

"A. He sounded a little bit bewildered or surprised and said no, there was nothing he could do, and said 'This thing is out of my hands,'"

12. On January 25, 1956, Merryweather inquired at the Bank if the Bank could act as Pendleton's agent in paying off the Pendleton note. Merryweather needed a simultaneous exchange of the stock certificate in order to raise money to pay off the loan. The trial court found, and we agree, that under the Bank's agreement with Pendleton, the Bank could, at its option, collect amounts due T. T. Pendleton, but the agreement did not authorize the Bank to transfer the stock, which was in Pendleton's name, to Merryweather. It follows that the Bank's refusal to deal on Merryweather's terms did not excuse a further tender to Pendleton.

13. "The rule is one of natural justice. A debtor is released from the payment of interest on the supposition that he has been deprived of the use of the money, by holding himself in readiness all the time to pay his creditor on the demand of the latter. Using the money after refusal by the creditors to receive it destroys this effect of a tender, and the debtor is chargeable with interest as though no tender has been made." 52 Am.Jur. Tender § 31.

14. At the close of the Plaintiff's case (and before the motion to amend discussed above) counsel for plaintiff made the following statement:

"We have no controversy with the Valley Bank in this matter except to prevent his stock from getting in the hands of an innocent purchaser, and that is our sole purpose. We will stipulate that the money is due to the Bank, and that they have a prior lien in payment of their loan on this stock. Our controversy is entirely with T. T. Pendleton, and the other matters are incidental. All we are interested in is the maintenance of the status quo of the corporation in holding this stock where it is, so that innocent parties don't get involved in it.

"The Court: Then as I understand, Mr. Mallamo, you are not contending then that the Valley Bank had any notice of any transaction other than what appeared?

"Mr. Mallamo: No, we don't make that contention. We believe that the evidence shows and under the law they are bound by the same knowledge as T. T. Pendleton relative to those transactions, but we don't make a point of issue as to that. We have no quarrel with the Bank. They put up money and are entitled to get it back * * *."

**346**

UDALL, Vice Chief Justice (dissenting).

I do not agree with the decision reached by the majority of the court on rehearing of this case. In reaching their decision they have omitted from consideration some of the important facts affecting the conclusions reached by the trial court.

At the outset it should be noted that the contract between the parties is clear and free from ambiguity. The intention of the parties can best be determined by reading that document and not the one here substituted for the parties by the court.

The record shows that the parties reached a tentative agreement on or about August 1st of 1954 whereby Pendleton would loan Merryweather $180,000 and take a pledge of the stock as security. About November 1st of 1954, however, Merryweather told Pendleton he needed $200,000, and later the same year he said he needed $220,000 to redeem the stock from Haggard. To further complicate Merryweather's problems, before the end of 1954 he was sued for $32,000 and a writ of garnishment was served on his creditors. Merryweather admits that the serving of this writ caused Pendleton concern (T.R. 558) as well it might since the record shows that from June of 1953, when Merryweather borrowed $160,000 from Pendleton to pay Haggard, until the end of 1954, Merryweather's obligations increased from $160,000 to $220,000.

Moreover, from the time he originally purchased the stock until January of 1955 Merryweather had never reduced his indebtedness for which he pledged the stock, and had never made a payment on the same except by borrowing a greater sum to pay off the previous creditor. In light of his rapidly declining credit standing Merryweather had little if any reason to believe that his contract with Pendleton was anything but one of sale.

The majority opinion also ignores the fact that when Pendleton borrowed the $200,000 from the bank (to purchase the stock from Merryweather) he was required to pledge 2,797 shares of his own Baca Float Ranch stock, as well as the 5,997 shares purchased from Merryweather, as security. The trial court valued the Merryweather block of 5,997 shares at $394,000 or nearly $65.70 per share. On this basis Pendleton was required to pledge an additional $183,763 of his own capital to obtain the $200,000 loan from the bank. It is at best improbable that Pendleton could have been induced to put up that much collateral for no more than the privilege of borrowing $200,000 with which to make a *loan* to Merryweather, especially when he (Pendleton) would not receive so much as one dollar as consideration. For if it was a loan, as claimed by Merryweather, the 5% interest goes to the bank and no consideration is given to Pendleton.

Furthermore, the bank was not satisfied with even this total pledge of 8,794 shares of stock by Pendleton. Far from it. The bank also required Thomas F. Griffin to sign a "take-out" letter agreeing to buy at $42 per share 5000 of the pledged Pendleton shares in the event Pendleton retained ownership of the 5,997 (Merryweather) block for at least 14 months. Evidently the bank did not share in the rosy outlook for Baca Float Ranch stock which counsel for Merryweather argued at trial and here on appeal. Moreover, it is unrealistic to believe that the bank would require such a "take-out" letter if it knew that the transaction was not a bona fide sale of the stock.

I am not prepared to acknowledge that the parties intended to enter into the type of contract which the majority now substitutes for them in place of their plain unambiguous contract of sale with option to repurchase. Nor can I believe that the vice president of the bank would accept, incident to the bank's loan to Pendleton, a document that was not what it purported to be on its face. To have engaged in such a practice would have been violative of the banking laws of the state and would seriously undermine the quality of the securities which the bank is required to have in protection of its depositors.

But we need not surmise as to what the bank's representatives thought of the transaction. For Patton, the Valley Bank's vice president, testified that he understood the agreement to be a bona fide sale, and that neither T. T. Pendleton nor Merryweather, nor anyone else, ever told him or in any manner indicated that the agreement was not what it purported to be.

The trial court also had before it the fact that Merryweather authorized that the stock be transferred on the books of the corporation to Pendleton and that the money was pledged to the bank by Pendleton in Merryweather's presence and with his approval.

Finally, the majority of the justices of this court now state that the trial judge properly instructed the advisory jury that plaintiff had the onus of proving " * * * by clear and convincing evidence that the transaction was a pledge or mortgage rather than a sale * * *." At the same time, however, they assert that the trial judge erroneously imposed a greater burden on plaintiff respecting proof of the debt requirement. In other words the trial judge correctly instructed the advisory jury on the law but was mistaken when he applied the law himself. I cannot attribute such inconsistencies to the trial judge.

The majority opinion seizes upon the words "beyond question" as indicative of the trial judge's "clearly erroneous" view

respecting the burden of proof of one attempting to show that an instrument ostensibly one of sale with option to repurchase is in fact an equitable mortgage or pledge. With this interpretation I cannot agree. Omitted from the quotation of the trial judge's reasons for granting defendant's motion for judgment is the following passage:

> "* * * [I]t goes without saying that to construe an instrument as a mortgage, which on its face is clear and unambiguous, evidence which is clear and convincing must be established to show that it was in fact a mortgage rather than a sale as it purports to be on its face * * *."[1]

It is clear to me that the trial judge was not mistaken as to what he was requiring of the plaintiff.

As is admitted in the majority opinion the "* * * testimony of the parties diverges" as to whether a sale or loan was intended. For the reasons set forth herein and in my original opinion in this case I remain convinced that the trial judge correctly applied the clear and convincing standard and resolved the acknowledged conflict in the evidence in favor of defendant.

---

1. The language contained in the trial judge's memorandum decision is set out in the original opinion in this case at 90 Ariz. 219, 222–23, 367 P.2d 251, 252–53. Interestingly, the majority opinion's careful consideration of the trial judge's memorandum opinion is in direct conflict with the oft repeated rule of this court that the memorandum opinion of the trial judge cannot form the basis of an assignment of error. E. g., Schwartz v. Schwerin, 85 Ariz. 242, 336 P.2d 144 (1959).