508 P.2d 55

Mary **SHELTON**, Administratrix of the Estates of Mose Broussard, Deceased, and Georgia Mae Broussard, Deceased, Appellant,

v.

D. C. **CUNNINGHAM**, Appellee.

No. 11005–PR.

Supreme Court of Arizona,
En Banc.

March 23, 1973.

Rehearing Denied April 24, 1973.

Herbert Mallamo, Phoenix, for appellant.

Pollock & Lemberg by Gerald A. Pollock, Phoenix, for appellee.

HAYS, Chief Justice.

This case is before us on a petition to review a decision of the Court of Appeals reported at 17 Ariz.App. 550, 499 P.2d 164 (1972), affirming a judgment of the Superior Court. The opinion of the Court of Appeals is vacated and the judgment of the Superior Court is affirmed.

The plaintiff below is the administratrix of the estates of Mose and Georgia Mae Broussard, deceased.

Mose died shortly after the transaction involved in this case, and Georgia died before the trial. At the time of the transaction, Mose was 77 years old.

In September, 1962, Mose owned the home in which he and his wife, Georgia Mae, lived with their children. He and the defendant, D. C. Cunningham, did gardening and yard work, and sometimes had worked together. They were friends, but not close ones. Their incomes were small. Their educations were poor; Cunningham had gone through the third grade, and Mose couldn't sign his own name. Though Mose owned his home, it had been foreclosed, and when he came to see Cunningham, he had five hours to raise $1056, failing which he would lose the property.

Cunningham had some money in a savings institution, and withdrew it to pay off what was overdue on Mose's home. The sole question in this case is whether Cunningham loaned Mose the money or whether he bought the home from Mose. The transaction took the form of a deed from the Broussards to Cunningham. This action in the lower court was brought to have the court declare the conveyance to be an equitable mortgage. It was heard by the court with an advisory jury. The jury answered two interrogatories: (1) that the value of the property was $2500 at the time of the transaction, and (2) that both parties intended the transaction to be an outright sale. The trial judge agreed, and adopted the jury's view, and plaintiff appealed. The Court of Appeals affirmed.

The difficulty in deciding this case is not due to conflicting legal theories, but rather to vague, conflicting and incomplete facts. Mose Broussard was not alive to tell his side of the story, and Cunningham, 83 years old at the time of the trial, could hardly be expected to recite, with complete clarity, events which took place some six years before. In addition, when two men with very little education attempt to deal in real property without benefit of counsel, it is inevitable that some misunderstandings will arise.

The picture that comes through on reading the testimony is that of a simple man helping out a friend. Some of this testimony was to the following effect.

"Q. He said he was going to lose the house unless you helped him out?

"A. Yes sir. I think he had about four or five hours to redeem it.

"Q. What did you do then?

"A. I told Mose this. . . . 'If you and Georgia will give me a deed to the place, sell the place to me'—and that is what he come to do, he come for me to buy the place. . . .

"Q. And you were going to give him a chance to get the money and pay you back?

"A. Well, he had five years to do it. . . . I was going to sell him the place back, that was the agreement. . . . He didn't have that on the escrow but that was between him and me.

"Q. How much money did you want back from him?

"A. I don't know, we didn't have no agreement at all. . . . He said he would pay me rent until he got able to get me a down payment.

"Q. What were you going to sell him the property back for?

"A. . . . I didn't mean to make too much off of him.

"Q. And what was that conversation?

"A. He says . . . '[i]f you'll buy and give me a chance to buy it back . . . I'll keep up all of the expenses, and you won't have to be out a thing but what you will be out of buying. I'll pay you rent until I'm able to pay your down payment.'

"Q. Was Georgia May present during that conversation?

"A. Yes sir . . . and I went far enough with Georgia to say . . . 'Georgia, friendship is worth a whole lot to me. . . .'

"Q. Did you explain to her that it was a sale?

"A. Yes sir, she knew it was a sale.

"Q. Now you never made any agreement as to when and for how much you would sell it back, is that right?

"A. No sir, no sir.

"Q. That was just someday that was going to be done?

"A. Someday it would be done, yes sir.

"Q. Would you have loaned Mose that amount of money?

"A. No sir, not only Mose, I ain't never been in the loaning business. . . ."

Mary Shelton, the Broussards' daughter testified that when her father came home from the title company, he told her and his wife that Mr. Cunningham had paid off the debt and that "he had to put up the deed . . . and when they pay him his money back, he would release the deed to the house."

The evidence showed that immediately after the money was advanced, Mose began paying $45 per month "rent" for being allowed to live in the house; that Cunningham issued rent receipts to Mose; and that Mose used them to show the welfare authorities that he did not own the house, and how much his monthly payments were for living quarters.

Georgia Mae, several years after the deal was made, and after her husband's death, decided to treat the rental payments as repayments on a loan, and when she decided that she had paid back more than Cunningham had advanced, she refused to pay any more rent and demanded that the property be deeded to her. Cunningham successfully sued to evict her, and rented the property to another family. This lawsuit followed.

The equitable mortgage doctrine is a device used to prevent an avaricious lender from taking advantage of a distressed borrower. Even without avarice and distress, lenders have a natural dislike for taking a mortgage as security, because of the time and expense of a foreclosure upon default, and the tying up of the property during the redemption period. Other lenders don't like the ceiling on interest imposed by the usury laws. Were it not for the doctrine of equitable mortgage, they would always take an absolute deed, with an option to the borrower to repurchase at a much higher figure.

In order to give some guidelines, we set out in Merryweather v. Pendleton, 91 Ariz. 334, 372 P.2d 335 (1962), six conditions that influence the determination whether the doctrine of equitable mortgage should be applied. These six criteria were not intended to be exhaustive. There are others. Another, for example, would be the relative sophistication of the parties, and whether one was engaged in the business of loaning money. Had a mortgage banker advanced the money to a man who couldn't sign his own name, the picture would be much different. Here, however, we have two old men with little education, and no evidence that one was trying to take advantage of the other. One thing which is *not* a criterion in determining the issue, is whether there is a note or mortgage signed by the borrower. In every case where the lender takes a deed in lieu of a mortgage, the note and mortgage are conspicuous by their absence.

In cases where the central issue is whether an outright sale or a mortgage was intended, the burden is upon the borrower to establish, not merely by a preponderance of the evidence, but by *clear and convincing evidence,* that a loan was intended. Merryweather, *supra.* Even though the jury was purely advisory, we may take its answers to the interrogatories as a guide to the demeanor and veracity of the witnesses. *Ibid.* No findings appear in the record. However, the trial court will be deemed to have made every finding of fact necessary to support its judgment. In re Estate of Harber, 104 Ariz. 79, 89; 449 P.2d 7. Further, the trial court's findings will not be distrubed if they are supported by reasonable evidence. *Ibid.*

It would appear—taking the facts in the light most favorable to sustaining the trial court's decision—that Cunningham and Mose Broussard agreed that the former would buy the house and rent it to Mose until such time as Mose had sufficient funds to start paying back the amount ad-

vanced. Despite Georgia Mae's feeling that the rental payments were payments on the "loan," they must be considered as rent, and as such, cannot be applied to the sum advanced by Cunningham. He testified that he would still honor his promise to sell the home back. However, in such case, he would be entitled to $1056 plus interest. No tender was made nor was there any showing that plaintiff had any money. Plaintiff's position was that the debt had been entirely paid off—a position that the court and jury did not accept. Furthermore, plaintiff did not come into court with clean hands. The Broussards had promised to pay all expenses, and failed to do so. It is then a case where plaintiff is asking a court of equity to force the defendant to honor a promise, when the plaintiff herself (or at least her predecessors in interest) did not honor hers.

The plaintiff was clearly at a disadvantage in not having Mose alive to testify, and in having to meet a burden of proof by clear and convincing evidence. She failed to do that, and for that reason, the judgment is affirmed.

CAMERON, V. C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.