NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

DAVID LEE LUDERS, et al.,
*Plaintiffs/Appellees*,

v.

LANCE KINGSTON, et al.,
*Defendants/Appellants*.

No. 1 CA-CV 21-0191
FILED 12-21-2021

---

Appeal from the Superior Court in Maricopa County
No. CV2019-090089
The Honorable Andrew Russell, Judge *Pro Tempore*
The Honorable Tracey Westerhausen, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Anderson Clarkson Johnson Brown, PLLC, Mesa
By Adam C. Anderson
*Counsel for Plaintiffs/Appellees*

Fredenberg Beams, LLC, Phoenix
By Daniel E. Fredenberg, Christian CM Beams, Christopher Skinner
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Judge David D. Weinzweig delivered the decision of the Court, in which Presiding Judge Peter B. Swann and Judge Paul J. McMurdie joined.

---

**W E I N Z W E I G**, Judge:

¶1        Raymond Kingston, The 2017 RFK Trust and Lance Kingston (collectively, "the Kingstons") appeal the superior court's grant of summary judgment to David and Chrissy Luders (collectively, "the Luders") on their equitable mortgage claim.  We reverse and remand for the court to enter summary judgment for the Kingstons.

**FACTS AND PROCEDURAL BACKGROUND**

¶2        This appeal concerns dueling claims of ownership to a six-bedroom home in Mesa.  Ms. Aurelia Flores purchased the home in 1990 for $89,000.  To fund the purchase, she borrowed an unknown amount from an unnamed lender and conveyed a deed of trust on the home to secure the loan.

¶3        Ms. Flores married Mr. Luders in 1994.  By some point in 2003, Mrs. Luders could not afford the mortgage payments and asked her then-boss, **Andrew Goforth**, for help.  Goforth purchased the home from Mrs. Luders in 2003.  Although the record contains no supporting documents or information, the Luders maintain that Goforth purchased the home "in exchange for Goforth's agreement to pay the $130,000 mortgage on the property," and agreed the Luders could repurchase the home for the same amount.  The superior court later described this arrangement as follows: "[T]he Luders made payments to [Goforth] as if he was the lender and they were the borrowers."

¶4        Goforth later soured on the arrangement.  Three years had elapsed, and the Luders had not repurchased the home.  Although the record contains no supporting documents or information, Mrs. Luders claims she asked Goforth in mid-2006 to sell the home to **Morgan Thurston**.  According to Mrs. Luders, Mr. Thurston had agreed to step into Goforth's shoes and acquire title, but only until the Luders could repurchase the home.

¶5 Just months later, however, the Luders moved from Mesa to their current home in Hawaii (the Island of Kauai), where Mr. Luders has two businesses.

¶6 About three years after that, Thurston defaulted on the loan he used to purchase the home. His lender foreclosed on the home, which Thurston had pledged as security. The home was auctioned off at a trustee's sale in July 2010. **A&S Capital** acquired title to the home as the highest bidder.

¶7 But A&S quickly pivoted and sold the home for $110,000 to **DC Nicoll Investments** and its sole member Don Nicoll. Nicoll could not recall how he learned about the home but recounted, "we were in the recession" and he "was buying homes and flipping them." At an evidentiary proceeding in this lawsuit, Nicoll assured the court he acquired the home to advance his "own financial interest" and would not have knowingly purchased the home if there was "any kind of cloud or other claim on the title." DC Nicoll Investments needed "a hard-money loan to buy" the home.

¶8 At some point, either during or after the real estate transaction, Nicoll learned the home once belonged to Mr. Luders. As Nicoll explained it, "[Mr. Luders] was a year behind me at school, we didn't hang out together, but we played football together, so I knew who he was. And so I called him to find out what was going on."

¶9 Although the arrangement was never put in writing, Nicoll agreed the Luders could cover DC Nicoll Investment's monthly interest payments on the hard money loan in exchange for an option to "quickly" purchase the home for $135,000, which would "buy [DC Nicoll Investment's] position out of that loan." Nicoll later told the court under oath that he wanted to help an old classmate and never believed the Luders had a legal interest in the home:

> Q. So you were just doing it to help him out, even though he had no real legal claim to it?
>
> A. That's true.

*Nicoll Sells Property to Mr. Kingston*

¶10 Nicoll "grew tired of this arrangement" after a few months because the Luders could not afford to exercise the option and he "wanted [his] money" out of the property. To preserve his arrangement with Nicoll,

Mr. Luders hired a headhunter to locate a "hard money lender . . . to buy out Mr. Nicoll." That headhunter found **Raymond Kingston**. Mr. Kingston had no prior dealings with the Luders.

¶11 After direct negotiations in January 2011, Mr. Kingston agreed to purchase the property from Nicoll for $135,000, which "represented a small profit to" Nicoll and covered the headhunter's fee.

¶12 Mr. Kingston paid the purchase price directly to Nicoll and took title to the home by special warranty deed. No money passed through the Luders. The warranty deed identified DC Nicoll Investments and Nicoll as the "Grantors," and identified Raymond Kingston as the "Grantee[]." As part of the transaction, Mr. Kingston negotiated about $18,000 worth of repairs. The Luders claim they performed the repairs for $35,000.

*Lease Agreement and Option Agreement*

¶13 Given the Luders' "emotional" interest in the home, Nicoll asked Mr. Kingston to continue Nicoll's option arrangement with the Luders. Mr. Kingston signed and circulated two documents to the Luders for review and signature—a 12-month Lease Agreement dated January 7, 2011, and an undated Standard Real Estate Purchase and Sale Agreement ("Option Agreement").

¶14 The Luders never signed either agreement. The Lease Agreement required monthly rent payments of $2,025 from the Luders and authorized the Luders to sublease the home. The Option Agreement granted a one-year option for the Luders to purchase the home for $135,000. It explained, "[t]he intent of this sale agreement is to allow the Buyer time to obtain financing to purchase the home from Seller," and "[f]rom commencement of this Sales Agreement[,] Buyer will have one year to close Escrow." Both agreements had an integration clause. The Luders did not pay taxes or insurance on the home. Nor did they claim loan or mortgage payments on their taxes.

¶15 By January 2012, the Luders had not renewed the lease nor exercised the purchase option. They continued, however, to lease and sublease the home, and Mr. Kingston granted their request to reduce the monthly lease payments from $2,025 to $1,400. The Luders provided 12 blank checks to Mr. Kingston for 12 months of payments. Some checks bounced and the Luders missed some payments (33 in all), but Mr. Kingston took no action.

¶16 Mr. Kingston had Parkinson's disease, which began to impair his speech in late 2017. As a result, his son Lance assumed power of attorney to handle his affairs. But Mr. Kingston's mind remained sharp, and Lance continued to consult him about the Luders.

¶17 At some point in 2018, the Luders asked Mr. Kingston to sell the home to their son Michael and his wife for around $200,000.[1] As explained by the Luders, "we raised our children here," and "we want to see our grandchildren running down the hall." Mr. Kingston agreed, and the son opened escrow. But Mr. Luders then demanded money from the son to compensate him and Mrs. Luders for their "equity" in the home. For her part, Mrs. Luders considered herself the "owner" of the property at this point and she complained "[t]here was just money for this fee, money for that fee," and "no money to Chrissy and Dave Luders." But the son refused to pay, and the Luders asked Mr. Kingston to "kill the deal" in September 2018.

¶18 By this time, Mr. Kingston had decided to list the home for sale. Lance told the Luders in November 2018, and he refused to accept any more rent payments from the couple. The Luders insisted they owned the home and that Mr. Kingston only possessed an equitable mortgage on the property. They offered to obtain financing and redeem the mortgage. The Kingstons refused, having found a buyer willing to pay $300,000. The Luders filed a notice of interest and a lis pendens. The property was mostly vacant, except for the Luders' refrigerator and some odds and ends.

¶19 The Luders visited in January 2019 and discovered that someone had changed the locks on the house. Mr. Luders later told the court he had scheduled a meeting on that day at the house with some friends who wanted to sublease the property for $1,800 per month. The Luders entered the home through a back door. Lance Kingston called the police to remove them from the home.

*This Lawsuit*

¶20 The Luders sued Mr. Kingston on January 18, alleging breach of contract, unlawful detainer, equitable mortgage, conversion, unjust enrichment and intentional interference with business relations and expectancy. They sought injunctive relief and a declaratory judgment. In

---

[1] At the evidentiary hearing, Lance Kingston and his attorney mistakenly called this arrangement "the loan plus missed interest payments," but corrected themselves.

the alternative, they claimed they were month-to-month tenants and should have received a notice of termination before eviction.

*Evidentiary Hearing*

¶21 A superior court commissioner held an evidentiary hearing on the Luders' application for preliminary injunction in February 2019. The court admitted documents into evidence and heard testimony from Mr. and Mrs. Luders, Nicoll and Lance Kingston. Although not convinced of the merits, the court granted the preliminary injunction to preserve the status quo.

¶22 The court determined the Luders were tenants and Mr. Kingston was allowed to evict them as the landlord under the unsigned lease agreement. The court also made various factual findings in its order and listed them as either favoring or disfavoring the equitable mortgage theory. To support an absolute sale from Nicoll to Mr. Kingston, the court found (1) no evidence of prior negotiations between Mr. Kingston and the Luders, (2) no evidence the Luders "were experiencing distress (this was, after all, not their primary residence)," (3) no evidence of the home's value in 2011, (4) evidence that the Luders "had many years of experience with this type of transaction," and (5) evidence that the Luders have never claimed their "rent" payments as "mortgage" payments on federal or state income tax returns. To support an equitable mortgage, the court found (1) a contemporaneous agreement for the Luders to purchase the home, (2) "the amount 'loaned' by Mr. Kingston approximates the amount [the Luders] allegedly owed to Mr. Nicoll," (3) Mr. Kingston was a "hard money lender," (4) Lance Kingston used the terms "loan" and "interest payments," rather than lease and rent payments, in response to a question at the evidentiary hearing, and (5) "[p]erhaps most notable," Mr. Kingston did not foreclose when the Luders "missed several monthly payments," adding that Mr. Kingston asked the couple for permission to sell the home.

*Stipulation*

¶23 From there, the case was reassigned to a superior court judge. The parties stipulated to file competing motions for summary judgment and "agreed that the Court could decide the case on the motion papers." Each party filed a motion for summary judgment and statement of facts, and the court held oral argument.

¶24 In May 2020, the court entered "partial summary judgment" for the Luders on their equitable mortgage claim: "The Court agrees that Plaintiffs have established an equitable mortgage in their favor, and that

6

Kingston is a lender on that mortgage, not the owner of the Ivy Street home." The court concluded that the Luders owed Mr. Kingston the sum of $135,000 as principal under the equitable mortgage, plus unpaid interest payments. The Kingstons timely appealed. We have jurisdiction. *See* A.R.S. § 12–2101(A)(1).

## DISCUSSION

**¶25** From the start, the parties disagree about the standard of review and the meaning of their procedural stipulation in the superior court. If the parties intended for the court to conduct a paper bench trial on disputed material facts, the stipulation missed the mark. *See Starsky v. Williams*, 512 F.2d 109, 113 (9th Cir. 1975) (citation omitted) ("[W]hile summary judgment cannot be granted where there are questions of fact to be disposed of, even by consent of all concerned, there is no reason why parties cannot agree to try a case upon affidavits, admissions and agreed documents."). The record instead shows that each party moved for summary judgment, and the superior court entered partial summary judgment for the Luders.

**¶26** We review an entry of summary judgment de novo, *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12 (2003), and we review questions of law de novo, *United Servs. Auto. Ass'n v. DeValencia*, 190 Ariz. 436, 438 (App. 1997).

### I. The Doctrine of Equitable Mortgage

**¶27** The Kingstons argue the superior court erroneously entered summary judgment for the Luders on the equitable mortgage claim. Arizona courts have embraced the doctrine of equitable mortgage to prevent avaricious lenders from exploiting distressed borrowers by hand-crafting arrangements to avoid usury laws and the statutory hassles of foreclosure, like redemption rights. *Shelton v. Cunningham*, 109 Ariz. 225, 228 (1973); *see also* A.R.S. § 33-702 ("Every transfer of an interest in real property, . . . made only as a security for the performance of another act, is a mortgage."). The burden to prove an equitable mortgage is elevated: the would-be borrower must prove by clear and convincing evidence that a grantor and grantee intended their real estate transaction to function as a secured loan, not as a bona fide sale. *Shelton*, 109 Ariz. at 228.

**¶28** The first hurdle for an equitable mortgage claim is evidence of a borrower-lender relationship between grantor and grantee. *See Downs v. Ziegler*, 13 Ariz. App. 387, 390 (1970). "The first and foremost factor to be considered in determining whether a conveyance is an equitable mortgage or a deed absolute is the existence of a borrower-lender relationship

between the parties." *In re Seven Springs, Inc.*, 159 B.R. 752, 756 (Bankr. E.D. Va. 1994). Once this hurdle is passed, Arizona courts consider seven non-exhaustive factors in a quest to determine whether a real estate transaction "was for security purposes or was a bona fide sale." *Merryweather v. Pendleton*, 91 Ariz. 334, 342 (1962); *Shelton*, 109 Ariz. at 228. Only "[w]hen a borrower-lender relationship between a grantor and grantee is established" may the court "then take into account circumstantial factors to determine whether or not the conveyance created an equitable mortgage." *In re Seven Springs*, 159 B.R. at 756.

¶29 Like a broken kite, the Luders' equitable mortgage theory never leaves the ground. First, in equitable mortgage parlance, the Luders were not the "grantors" for the January 2011 home "conveyance" from Nicoll to Mr. Kingston. The Luders did not own the home or sell it to Mr. Kingston. Rather, Nicoll owned the home and he sold it to Mr. Kingston. The record confirms this point. As mentioned above, DC Nicoll Investments purchased the home from A&S Capital in 2010, just weeks after Thurston's lender foreclosed and A&S had acquired the home free and clear at a trustee's sale. *Cf.* Restatement (Third) of Property (Mortgages) § 7.1 (1997) ("A valid foreclosure of a mortgage terminates all interests in the foreclosed real estate that are junior to the mortgage being foreclosed and whose holders are properly joined or notified under applicable law."). Mr. Kingston then purchased the home from DC Nicoll Investments in 2011, paying Nicoll directly. And the warranty deed therefore shows that DC Nicoll Investments was the "Grantor[]," and Raymond Kingston was the "Grantee[]."

¶30 Second, the conveyance did not create a lender-borrower relationship between Mr. Kingston and the Luders. At most, Mr. Kingston offered a one-year lease agreement for the Luders to rent the home, and a one-year option agreement for the Luders to purchase the home at a particular price, although the Luders never signed the agreements or exercised the option before it expired in 2012. *See Shelton*, 109 Ariz. at 228 (rejecting equitable mortgage theory when the parties agreed that one party "would buy the house and rent it to [the second party] until such time as [the second] had sufficient funds to start paying back the amount advanced").

¶31 Neither the expired lease nor the unexercised option agreement created a lender-borrower relationship. *See Downs*, 13 Ariz. App. at 390 ("[T]he presence of a subsisting obligation" is "[o]f primary importance in Arizona in determining whether a transaction was intended to be a security device, i.e., a mortgage, or an absolute conveyance.");

*Charter Gas Engine Co. v. Entrekin*, 30 Ariz. 341, 346 (1926) (finding no equitable mortgage where there was no obligation or subsisting indebtedness created or continued by the parties' agreement). At most, the unexercised and expired option agreement only preserved the Luders' right to acquire the home at a certain price before a certain time. *See* Restatement (Second) of Contracts § 25 (1981); *see also Halle v. Comm'r*, 83 F.3d 649, 654 (4th Cir. 1996) (citation omitted) (An option "gives the optionee no present estate, and imposes on him no obligation to consummate the transaction"); *Johnson v. Washington*, 559 F.3d 238, 243 (4th Cir. 2009) ("[A]n option to repurchase is not an obligation to repurchase, and therefore does not constitute a debt between the parties.").

**¶32**        These shortcomings are dispositive and leave no reason to examine the traditional equitable mortgage factors, which presume a conveyance and lender-borrower relationship between the grantor and grantee. *See Merryweather*, 91 Ariz. at 342 (the factors include "the distress of the grantor," and "the fact that the amount advanced was about the amount that the grantor needed to pay an existing indebtedness"). We reverse because the superior court legally erred in granting partial summary judgment to the Luders on their equitable mortgage claim.

## CONCLUSION

**¶33**        We reverse the superior court's entry of partial summary judgment and remand for entry of summary judgment in favor of the Kingstons on the equitable mortgage claim. We award the Kingstons their costs on appeal as the successful party, contingent on compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA