**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>DOUGLAS THORPE,<br>　　　　　　Debtor. | BAP No.  AZ-21-1216-BTL<br><br>Bk. No.  2:16-bk-13619-MCW |
| DOUGLAS THORPE,<br>　　　　　　Appellant,<br>v.<br>TJ 12, LLC,<br>　　　　　　Appellee. | Adv. No.  2:17-ap-00109-MCW<br><br>**MEMORANDUM\*** |

Appeal from the United States Bankruptcy Court
for the District of Arizona
Madeleine C. Wanslee, Bankruptcy Judge, Presiding

Before: BRAND, TAYLOR, and LAFFERTY, Bankruptcy Judges.

## INTRODUCTION

Appellant Douglas Thorpe ("Doug")[1] appeals a judgment denying his

request to recharacterize a property sale as an equitable mortgage, affirming

that the transfer of the property was an absolute sale and not intended as

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Because the Thorpe brothers share the same surname, we refer to them by their first names. No disrespect is intended. Douglas prefers to be called Doug.

1

security for repayment of a loan, and awarding the buyer its attorney's fees and costs. Seeing no reversible error by the bankruptcy court, we AFFIRM.

## FACTS

Doug has a bachelor's degree in mechanical engineering. He designs, manufactures, and sells unmanned aircraft and drones. Troy McNaughton manages TJ 12, LLC ("TJ 12") and is in the family business of acquiring, improving, and renting or selling residential properties. He attended college but did not graduate, and he is a former professional athlete. He is also a licensed real estate agent.

In 1992, Dr. Sherman Thorpe ("Dr. Thorpe"), Doug's father, bought a residence in Mesa, Arizona ("Property"). Doug moved into the Property in 1995 and was responsible for the mortgage payments, maintenance, and repairs. In July 1999, Dr. Thorpe transferred the Property into the Sherman William Thorpe Living Trust dated October 26, 1988 ("Trust"). Doug's brother, William Thorpe ("William"), is an attorney and is the successor trustee of the Trust. The Trust provided, as did Dr. Thorpe's will, that Doug would receive title to the Property upon Dr. Thorpe's death. Dr. Thorpe died in December 1999, but title to the Property was never transferred to Doug.

Doug fell behind on the mortgage payments and the secured lender scheduled a trustee's sale of the Property. After a failed bankruptcy filing, Doug unsuccessfully sought out an $11,000 loan from Amerifirst Financial, Inc. ("Amerifirst") to cure the mortgage arrears and stop the looming

2

foreclosure. Although Amerifirst could not provide the loan, the loan officer told Doug that, with "50-60% equity" in the Property, it would not be difficult to find an investor to provide him with a "short-term loan."

Doug was then referred to McNaughton of TJ 12 for help. Although the details of what Doug and McNaughton discussed during their meeting were disputed, they agree that McNaughton asked Doug how much it would take to pay off the mortgage on the Property. Doug thought the payoff amount was $75,000, but it was later determined to be $95,000.

On August 8, 2013, TJ 12 and William, as trustee of the Trust, entered into a contract to sell the Property to TJ 12 for $96,000. The purchase price was based solely on the amount necessary to pay off the existing mortgage. William, as trustee of the Trust, executed a warranty deed and affidavit of property value transferring title to the Property to TJ 12. William did not negotiate any portion of the sale contract with McNaughton, and he had no opinion as to the Property's value. William signed the sale contract only because Doug asked him to.

On August 23, 2013, Doug and TJ 12 entered into an "Option Agreement" that allowed Doug to rent the Property, with an option to purchase it for $119,196.50 at any time before September 1, 2014. Doug could extend the purchase option for another year. Rent for the first year was $800 monthly, with payments to begin October 1, 2013.[2] If Doug did not exercise

---

[2] The option price was based on what TJ 12 paid for the Property (plus closing costs), plus $21,200, which included a $20,000 profit and $1,200 for the rent that would not be paid until the start of the rent payments on October 1, 2013.

the purchase option after year one, monthly rent for year two was $1,525, which included estimated taxes and insurance of $160.

The sale of the Property to TJ 12 closed on August 26, 2013. TJ 12 paid off the existing mortgage and all closing costs.

Doug fell behind on rent payments within a few months. By January 2015, he owed TJ 12 over $15,000 in rent. Doug never exercised the purchase option. He was evicted from the Property in January 2019.

During Doug's second chapter 13[3] bankruptcy case, he filed an adversary complaint against TJ 12, seeking to recharacterize the sale transaction as an equitable mortgage. On summary judgment, the bankruptcy court ruled that Doug lacked standing to assert an equitable mortgage claim because he never held legal title to the Property. Doug appealed to the BAP, which reversed, ruling that not holding legal title was not dispositive for an equitable mortgage claim. *See Thorpe v. TJ 12, LLC (In re Thorpe)*, BAP No. AZ-18-1330-LBF, 2019 WL 3778359 (9th Cir. BAP Aug. 9, 2019). On remand, the bankruptcy court held a trial on whether the ostensible sale transaction for the Property should be characterized as an equitable mortgage.

At trial, Doug testified that the transfer of the Property to TJ 12 was not a sale; it was a loan. In his mind, he was still the owner of the Property despite the transfer. The transaction, which Doug said McNaughton structured, was part of a deal that TJ 12 would pay off the mortgage on the Property, that Doug would make payments to TJ 12 as cash flow permitted,

---

[3] Unless specified otherwise, all chapter and section references are to the

4

and that when Doug received an expected payout of $650,000 from a lawsuit he had filed against the Department of Defense, he would pay TJ 12 back. Unfortunately, the expected lawsuit proceeds never came. Doug said he thought that the Property was worth between $200,000 and $218,000 in 2013, so to think he would have sold it to TJ 12 for $96,000 was "absurd." Doug said that if he had intended to sell, he would have asked his mother, a real estate agent for 40 years, for an agent referral.

McNaughton testified that TJ 12 intended only to purchase the Property; there was never an intent to make a loan to the Trust with the Property as collateral. McNaughton said he was not allowed inside the Property to inspect it before the sale, but he estimated he would need to invest $40,000 to $50,000 before he could resell it. Viewing only the outside, McNaughton's opinion was that the Property was dated, had original windows, the pool needed repairing, and because there was a tarp over part of the roof, that there were roof issues. McNaughton assumed the inside of the Property was in the same general condition as the outside. With the upgrades, McNaughton estimated he could resell the Property for $150,000 to $175,000. Thus, he believed it was worth no more than $100,000, if he was to make his preferred $20,000 profit.

To buy the Property, TJ 12 obtained a loan from Amerifirst for $91,000. The loan accrued interest at 18% per annum and had monthly payments of $1,365. McNaughton said he was willing to accept $800 a month from Doug

---

Bankruptcy Code, 11 U.S.C. §§ 101-1532.

for the first year's rent, even though the Amerifirst loan payments were $1,365, because TJ 12 was either going to sell the Property to Doug and make $20,000 or fix and sell it for more to another party.

McNaughton said he had done 20 lease-purchase option agreements similar to the one here, but those agreements were with an existing tenant in the property; he had never rented a property back to the previous owner after purchasing it. McNaughton said he only did the lease-purchase option here because Doug wanted to remain in the Property and was concerned that the potential purchaser at the foreclosure sale would require him to move out.

The bankruptcy court denied Doug's request to recharacterize the sale transaction as an equitable mortgage. Analyzing the factors an Arizona court considers for determining an equitable mortgage, the bankruptcy court found that Doug had not established by clear and convincing evidence that the parties intended to create a loan with the transfer of the Property intended to secure repayment of that loan, instead of an absolute sale of the Property. The bankruptcy court later entered a final judgment, which also awarded TJ 12 its attorney's fees and costs. Doug timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) & (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court err in denying Doug's request to recharacterize the sale of the Property as an equitable mortgage?

6

**STANDARDS OF REVIEW**

We review the bankruptcy court's conclusions of law de novo and its findings of fact for clear error. *Nichols v. Birdsell*, 491 F.3d 987, 989 (9th Cir. 2007). The bankruptcy court's finding that a transaction was an absolute sale or an equitable mortgage will be upheld unless it is clearly erroneous. *See Stephens v. Arrow Lumber Co.*, 354 F.2d 732, 734 (9th Cir. 1966); *In re S.F. Indus. Park, Inc.*, 307 F. Supp. 271, 274 (N.D. Cal. 1969). A bankruptcy court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record. *Retz v. Samson*, 606 F.3d 1189, 1196 (9th Cir. 2010).

**DISCUSSION**

**A.     Arizona law governing equitable mortgage**

"The equitable mortgage doctrine is a device used to prevent an avaricious lender from taking advantage of a distressed borrower." *Shelton v. Cunningham*, 508 P.2d 55, 58 (Ariz. 1973) (en banc). Under Arizona law, a deed purporting to be an absolute conveyance on its face will be deemed an equitable mortgage where clear and convincing evidence demonstrates that the intent of the parties was a security transaction. *Id*. This is true whether the conveyance is of chattel or of real property. *Weston v. Denny*, 480 P.2d 24, 26 (Ariz. Ct. App. 1971) (extending to real property *Merryweather v. Pendleton*, 372 P.2d 335 (Ariz. 1962), Arizona's seminal equitable chattel mortgage case); *accord Shelton*, 508 P.2d at 58. The parties' intent is established from the surrounding facts and circumstances. *Bostwick v. Jasin*, 821 P.2d 282, 284 (Ariz. Ct. App. 1991).

7

In evaluating whether a transaction was for security purposes or an absolute sale and discerning the parties' intent, Arizona courts consider six non-exclusive factors: (1) the parties' prior negotiations; (2) distress of the grantor; (3) whether the amount advanced was about the amount the grantor needed to pay an existing indebtedness; (4) the amount of consideration paid in comparison to the actual value of the property; (5) existence of a contemporaneous agreement to repurchase; and (6) the subsequent acts of the parties. *Merryweather*, 372 P.2d at 340-41; *Weston*, 480 P.2d at 26. No one factor is dispositive, "but a combination of several will go a long way in showing that an absolute conveyance was actually a security arrangement." *Merryweather*, 372 P.2d at 341. If there is any doubt, courts tend to hold that the agreement is a mortgage because this protects all parties and prevents forfeiture of the pledged property. *Id.* (citations omitted). Two additional factors considered by Arizona courts for an equitable mortgage include (7) the relative sophistication of the parties, and (8) whether one of parties is in the business of lending money. *Shelton*, 508 P.2d at 58 (adding these two factors to the six *Merryweather* factors).

**B.    The bankruptcy court did not err in finding that the transaction was an absolute sale.**

The bankruptcy court found that only two of the eight factors indicated that the transaction was a secured loan. The court found that, at best, Doug had hoped this would be only a short-term situation, and that when he received the lawsuit proceeds, he would be able to exercise the option and

8

purchase the sold Property. Such a hope, or Doug's unilateral desire for this to have been a short-term situation, however, did not change what was an absolute sale with an option agreement as the documents depicted.

Doug contends that all eight factors indicated that the transaction was a secured loan, and that the bankruptcy court misapplied the facts to the law to erroneously conclude it was an absolute sale. We review his arguments in turn.

### 1. Prior negotiations of the parties

The bankruptcy court found that this factor was not indicative of an equitable mortgage or that the parties intended a secured loan. This was their first transaction. Doug initially sought a loan from Amerifirst in an amount sufficient to reinstate the mortgage, but the loan was declined. He then met with McNaughton and requested a similar loan from TJ 12. McNaughton testified that he told Doug that TJ 12 was not interested in providing a loan, and that he did not start providing loans to individuals until 2014, one year after the transaction with Doug.

The evidence was conflicting on whether or not Doug told McNaughton that he owned the Property or that the Trust did. In any case, McNaughton knew that William, as trustee of the Trust, had to execute the documents for the transfer, which William did on Doug's request. The parties agreed that McNaughton structured the transaction as a sale, but Doug was the one who insisted on the purchase option.

Ultimately, the bankruptcy court found that, while Doug may have initially sought a small loan to reinstate the mortgage and avoid the pending foreclosure, McNaughton did not agree to provide a loan. The court found McNaughton's testimony regarding the transaction and whether he was willing to provide a loan believable and consistent with his prior and then-existing business practices. The court also found it inconceivable that Doug would enter into a transaction to borrow $96,000 when he needed far less than that to reinstate the mortgage.

Doug argues that if a purported seller was seeking a loan, the first *Merryweather* factor supports a finding of an equitable mortgage, and that the bankruptcy court erred in ruling otherwise. He cites *SAL Leasing, Inc. v. State ex rel. Napolitano*, 10 P.3d 1221 (Ariz. Ct. App. 2000). In that case, it was undisputed that a majority of SAL Leasing's customers came in seeking a loan, but SAL Leasing would only agree to sale/lease-back transactions. It was also acknowledged that at the time customers came in, they thought they were obtaining a loan. *Id.* at 1227. Here, there is no evidence of a history of transactions by TJ 12 similar to this one. There is also no evidence that TJ 12's customers, at least at the time of this transaction in August 2013 or before, came in assuming they were getting a loan.

Even if this factor could support a finding of an equitable mortgage like Doug argues, it was not illogical or implausible for the bankruptcy court to find that it did not. There was evidence demonstrating that Doug knew the transaction with TJ 12 was not a loan.

Doug also contends that the bankruptcy court set forth a series of irrelevant and convoluted arguments to find that the first factor was not indicative of an equitable mortgage. While the court made some observations about Doug's ability or desire to obtain a short-term loan, and some of its analysis as to the first factor perhaps belonged in its analysis of other factors, none of this rises to the level of error. *Merryweather* and *Shelton* do not mandate that the court engage in a precise "check the box" approach, and the bankruptcy court's more fluid approach here was not error.

### 2. Distress of the grantor

TJ 12 had argued that the "grantor" in this case was the Trust, which held legal title to the Property, and not Doug, who held only a beneficial interest. TJ 12 argued that without any evidence of the Trust's financial distress, there was nothing to support a finding that the transaction between the Trust and TJ 12 was really a secured loan.

Noting that it was unclear whether the court looks to the financial distress of the party holding legal title, or to the party holding the beneficial interest under a trust, the bankruptcy court ultimately decided that this factor was not clearly indicative of an equitable mortgage. Doug argues that the bankruptcy court erred by diminishing his distress because he was not the legal title holder. He relies on the Panel's prior decision to argue that his beneficiary status made no difference here, particularly since he directed that the Property be transferred to TJ 12. We tend to agree. Further, in *Shelton*, which was decided 11 years after *Merryweather*, the Arizona Supreme Court

11

did not limit this second factor to the distress of the "grantor," but noted that an equitable mortgage will be imposed to prevent an avaricious lender from taking advantage of a distressed "borrower." 508 P.2d at 58. Here, the "borrower" – assuming for the moment that the transaction was a secured loan – was Doug, since he was responsible for the monthly "rent" in order to stay in the Property.

Nonetheless, this was just one of eight factors the bankruptcy court had to consider. Even if we assigned error to its decision on this factor, it would not compel us to reverse and impose an equitable mortgage given the court's supported findings that nearly all of the other factors indicated this was a sale.

### 3. Amount advanced was about the amount grantor needed to pay an existing indebtedness

The bankruptcy court found that this factor "may" support a finding that the parties intended a secured loan. While the court found that the $96,000 TJ 12 paid to acquire the Property paid off the existing debt owed to the secured lender, this amount far exceeded the $11,000 to $14,000 Doug said he was seeking to reinstate the mortgage and avoid the pending foreclosure.

Though Doug agrees that this factor weighed in his favor, he takes issue with the bankruptcy court's "equivocating" analysis, which he says focused on the $11,000 to $14,000 he was originally seeking as opposed to the $96,000 received. He argues that the correct legal standard is whether the funds were used to pay an existing indebtedness. He argues that this factor

12

unequivocally supported the finding of an equitable mortgage, and to the extent the bankruptcy court found something less, it erred. While we disagree with Doug's statement of the legal standard, we agree that this factor supported the finding of an equitable mortgage. Regardless of what amount of money Doug was originally seeking, the fact is that what TJ 12 advanced was the amount needed to pay off the existing mortgage.

4. **Amount of consideration paid in comparison to actual value of the property**

TJ 12's appraisal of the Property done in 2018 included a retrospective value and indicated that it had a market value of $178,000 as of August 26, 2013, subject to certain qualifications. Doug offered a similar appraisal valuing the Property at $195,000.

Doug argued that the $96,000 TJ 12 paid was considerably less than the Property's value and supported an equitable mortgage, regardless of whether one considered TJ 12's appraisal of $178,000 or Doug's testimony that it was worth as much as $218,000. McNaughton, who was in the business of buying distressed properties to flip or to hold as rentals, testified that the purchase price of just under $100,000 was not considerably below fair market value given his calculation that he could resell the Property for $150,000 to $175,000 after he invested $40,000 to $50,000 in upgrades.

The bankruptcy court found that McNaughton's testimony was both believable and consistent with TJ 12's appraisal. The court also found that Doug's appraisal of $195,000 did not evidence that the amount TJ 12 paid for

the Property was disproportionate consideration. Based on these findings, the court concluded that the consideration TJ 12 paid to acquire the Property, and the amount proposed to sell the Property to the Doug if he exercised the option, were not substantially less than or disproportionate to the Property's fair market value. This was especially true when considered from an investor's perspective and the inherent risks involved in buying, fixing, and flipping real property. Consequently, this factor was not indicative of an equitable mortgage or that the parties intended a secured loan.

Doug argues that the bankruptcy court erred by applying a "flipper" standard to this factor. Instead of comparing the purchase price to the Property's fair market value, argues Doug, the court wrongfully utilized what a flipper would be willing to pay for it in a distressed sale, if the flipper intended to remodel it and make a comfortable profit. While Doug makes an interesting argument, *Merryweather* and its progeny have not implied that a real estate investor should not be able to purchase a distressed property for less than its "actual value" so as to be able to make a profit upon resale. And he cites no authority holding otherwise. Accordingly, we conclude that the bankruptcy court did not err in applying a "flipper" standard to this factor, or clearly err in finding that this factor was not indicative of an equitable mortgage.

### 5. Contemporaneous agreement to repurchase

The bankruptcy court found that the Option Agreement was a contemporaneous agreement to repurchase the Property, and that this factor

supported a finding that the parties intended a secured loan and not a sale. TJ 12 argues that the Option Agreement was not a contemporaneous agreement to repurchase because it was not an option for the grantor – the Trust – to "repurchase" the Property, but instead was an option for Doug to "purchase" it in the first instance. The bankruptcy court rejected this argument, finding that there was no legal distinction between an agreement to repurchase by a trust holding legal title and a beneficiary under the trust holding equitable title. Assuming TJ 12 can even make this argument absent a cross-appeal, we do not disagree with the court's ruling on this factor.

6. **Subsequent acts of the parties**

The bankruptcy court found that the subsequent acts of the parties indicated that they believed and acted as if the transaction was an absolute sale of the Property with an option to repurchase. The court focused on TJ 12's act of paying all taxes and insurance, especially during the first year, and charging rent at a rate far below the debt service.

Doug argues that the bankruptcy court erred by placing great weight on TJ 12's payment of taxes and insurance after the transfer. He focuses on the second year of the Option Agreement, when the rent was increased to $1,525 to include taxes and insurance of $160. Doug argues, because he was paying for these expenses and TJ 12 was acting essentially as an escrow agent in turning those funds over to the lender, this was indicative of a mortgage. We disagree. Doug fails to acknowledge that TJ 12 paid the taxes and insurance out-of-pocket for the first year. And TJ 12 charging higher rent in year two to

15

include those expenses is not necessarily indicative of a mortgage. It could also indicate a sale and a landlord's desire to charge a sufficient amount of rent to cover the taxes and insurance for its rental property.

Doug also argues that the bankruptcy court incorrectly considered things that were not the subsequent acts of the parties. The court observed that no reasonable businessperson would borrow funds at a cost of 18% and then charge monthly rent for the first year that was less than the costs of those funds. In the court's opinion, this fact weighed heavily against a loan and indicated that the transaction was a sale. Doug argues that TJ 12's motivations at the time of the transaction are not "subsequent acts" of the parties. Whether or not TJ 12's act of accepting only $800 a month for 12 months after the transfer was a subsequent act, the fact remains that TJ 12 was taking in far less than the Property's monthly costs, which indicates that the parties intended a sale, because no lender would take such a loss. McNaughton said TJ 12 willingly took a loss for that first year because a profit on the Property was anticipated either when it was sold to Doug for the option price or to a third party after necessary upgrades. Even if the bankruptcy court should have analyzed this fact somewhere else in its decision, it did not err by considering it. Clearly, this fact goes to the parties' intent. In any case, there were other subsequent acts sufficient to support the court's finding that this factor weighed in favor of a sale.

Doug argues that the bankruptcy court also erred by failing to consider the post-transaction text messages from McNaughton, which Doug argues

demonstrate that the parties intended a secured loan and not an absolute sale. In early 2016, Doug and McNaughton exchanged a series of text messages regarding the Property and Doug's rent default. McNaughton texted the following to Doug: "Yes, we need to get paid off. You can sell the house or get us paid off. Either way, we need our money out ASAP. It was supposed to be a year or less, and we are going on almost three years. Cannot go any longer." In another text McNaughton stated: "As long as we have the loan paid off by June 1st, we will be good."

While Doug argued that these text messages were proof the transaction was really a secured loan, McNaughton explained that when he made the comment about the "loan" needing to be "paid off," he was referring to TJ 12's loan for the Property and not any purported loan to Doug. And when McNaughton told Doug that he could "sell the house," he was referring to Doug's repeated assertions about finding a buyer for the Property, maybe even Doug's sister, who later did sign a purchase agreement but the deal fell through.

Whether the bankruptcy court considered the text messages is not clear. In any case, its choice to believe McNaughton's testimony over Doug's on the issue of their intent does not constitute reversible error. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

17

Lastly, Doug makes much of the fact that the Option Agreement provided that he, as opposed to TJ 12, was responsible for any repairs to the Property. He argues that if this was a true landlord-tenant relationship, such a clause would be contrary to Arizona law and suggests an equitable mortgage. While Doug's recitation of Arizona landlord-tenant law may be correct, the arrangement here was not a straight tenancy; it was a lease-purchase (or rent-to-own) arrangement. In that case, the parties might agree that the tenant pay for repairs since the tenant may ultimately own the property.

In summary, we see no clear error in the bankruptcy court's finding that the parties' subsequent acts revealed that they believed and acted as if the transaction was an absolute sale and not a secured loan.

### 7. Relative sophistication of the parties

The bankruptcy court did not find a vast difference between the sophistication of the parties. Doug argues that the court erred by not finding that he was relatively less sophisticated than TJ 12 given McNaughton's superior knowledge and experience in real estate transactions. But the test is not necessarily how much each party knows about real estate transactions. Rather, the court can also consider the parties' intelligence, education level, and bargaining power. *See Shelton*, 508 P.2d at 58.

The bankruptcy court observed that Doug is college educated and intelligent. It was he who insisted on the purchase option for the Property, yet now claimed that he had no intention of selling the Property and did not

understand the plain meaning of the documents he instructed William to execute, all of which the court found unequivocally indicated this was a sale. The court found that Doug's demand that a purchase option be included as part of the deal did not indicate a lack of sophistication; rather, it reflected an understanding of the transaction and the sophistication to orchestrate it to his benefit.

On this record, the bankruptcy court's finding that there was essentially no difference in the relative sophistication of the parties, and that this factor did not support a basis to recharacterize the transaction as a secured loan, was not clearly erroneous.

### 8. Whether one of the parties is in the business of lending money

Four days before the sale of the Property closed in August 2013, Amerifirst assigned its interest in the note and deed of trust to Arizona Instant Funding, LLC ("AIF"), an Arizona limited liability company managed by Sound, LLC. Sound, LLC was founded in 2009 by McNaughton's parents and brother-in-law, who co-owns TJ 12 with McNaughton. McNaughton testified that he had no ownership interest in AIF, but he was a member of Sound, LLC as of 2013. McNaughton admitted arranging for AIF to take over the loan on the Property before the transaction closed.

Prior to September 2014, neither McNaughton nor any of his entities had the required license for originating loans on residential homes; hence, the need for Amerifirst's involvement in the transaction. In September 2014,

19

McNaughton formed Sound Capital, LLC, which had a license for originating loans on residential homes. Conversely, McNaughton's "Linked In" webpage stated that he became active in the hard money loan business in 2012, not 2014. McNaughton testified that this was an error; he did not begin providing residential loans until 2014, which was one year after the Property transaction. Further, he provides loans only to real estate investors, never to a homeowner or on owner-occupied homes. McNaughton testified that in the four years prior to acquiring the Property, he or his entities had flipped over 120 properties and made no loans.

The bankruptcy court heard all of this evidence and found that McNaughton was not in the business of making loans through his entities when the subject transaction took place in August 2013. Rather, the evidence showed that he was not involved in such business until the year following the transaction. Consequently, this factor did not support a basis to recharacterize the transaction as a secured loan.

Doug argues that the bankruptcy court failed to acknowledge certain facts that proved McNaughton was in the business of lending money at the time of the transaction in August 2013. For example, McNaughton became a member of Sound, LLC in 2013. Doug says it was in January of 2013, but the testimony he cites does not support this. In addition, Doug notes that Sound, LLC is the manager of assignee AIF, and that McNaughton admitted arranging for AIF to take over the loan on the Property before the transaction closed. However, McNaughton testified that he had no ownership interest in

AIF, and that Sound, LLC had no ownership interest in AIF, it only managed it. He also testified that his "Linked In" webpage indicating that he had been in the hard money loan business since 2012 was an error. In any case, McNaughton's part in arranging for AIF to take over the loan before the transaction closed does not prove conclusively that he was in the business of lending money. On this record, we cannot say that the bankruptcy court's finding as to this factor was clearly erroneous.

Doug further argues that the bankruptcy court erred by suggesting McNaughton had to be in the business of "making" or "originating" loans in August 2013 for this factor to be satisfied, not just in the business of "lending money." Nothing suggests that the bankruptcy court made a distinction between being in the business of "making loans" and being in the business of "lending money" as Doug contends, or that this made any difference in its decision.

## CONCLUSION

At best, three of the eight factors supported Doug's position that the sale transaction should be recharacterized as an equitable mortgage. As a result, we conclude that the bankruptcy court did not err in finding that Doug had not met his burden to establish by clear and convincing evidence that the parties intended for the transaction to be a secured loan as opposed to an absolute sale. Accordingly, we AFFIRM.